UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

A. S., *on behalf of A.S., a child with disabilities, and* A.B., *on behalf of A.S., a child with disabilities*,

Plaintiffs,

– *against* –

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

**OPINION & ORDER**

24-cv-9689 (ER)

RAMOS, D.J.:

A.S. and A.B. (together "Plaintiffs"), both on behalf of their child, A.S., filed suit against the New York City Department of Education (the "DOE"), under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA"), New York State Education Law, and 42 U.S.C. § 1983, seeking funding for A.S.'s private school tuition for the 2023–24 school year. Doc. 1 at 24–29.  Before the Court are the parties' cross-motions for summary judgment. Docs. 14, 15.

For the reasons stated below, Plaintiffs' motion for summary judgment is DENIED and the DOE's motion for summary judgment is GRANTED.

## I.    STATUTORY FRAMEWORK

### A.  The IDEA

Congress passed the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

The statute mandates that any state receiving federal funds must provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 580 U.S. 386, 390 (2017). The FAPE provided by the state must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably calculated to enable the child to receive educational benefits." *Endrew F.*, 580 U.S. at 394.

A public school ensures that a student with disabilities receives a FAPE by providing the student with a uniquely tailored Individualized Education Plan ("IEP"). *Id.* at 391; *see* 20 U.S.C. § 1401(9). An IEP is a written statement, collaboratively developed by the parents of the child, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.O. v. New York City Department of Education*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v. New York City Department of Education*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Florida Union Free School District*, 142 F.3d 119, 123 (2d Cir. 1998). The IDEA further mandates that the FAPE "meet the standards of the State educational agency." 20 U.S.C. § 1401(9)(B). In New York, the task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the school district. *Walczak*, 142 F.3d at 123 (citing NY Education Law § 4402(1)(b)(1); *Heldman v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)). "CSEs are comprised of members appointed by the

2

local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing NY Education Law § 4402(1)(b)(1)(a)). "In developing a child's IEP, the CSE is required to consider four factors: '(1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs.'" *E.A.M. v. New York City Department of Education*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at * 1 (S.D.N.Y. Sept. 29, 2012) (quoting *Gagliardo v. Arlington Central School District*, 489 F.3d 105, 107–08 (2d Cir. 2007)) .

To provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive educational benefits," "likely to produce progress, not regression," and afford the student with an opportunity to achieve greater than mere "trivial advancement." *Cerra v. Pawling Central School District*, 427 F.3d 186, 194, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30). The IEP includes, among other things, "a statement of the child's present levels of academic achievement and functional performance," "a statement of measurable annual goals," and "a description of how the child's progress toward meeting the annual goals . . . will be measured." 20 U.S.C. § 1414(d)(1)(A)(i)(II), (III).

"Congress repeatedly emphasized throughout the [IDEA] the importance and indeed the necessity of parental participation in both the development of the IEP and any subsequent assessments of its effectiveness." *Honig v. Doe*, 484 U.S. 305, 311 (1988). As a result, states must allow parents "to seek review of any decisions they think inappropriate." *Id.* at 312.

New York State has implemented a two-tiered system of administrative review for disputes regarding "any matter relating to the identification, evaluation or educational placement" of a student with a disability "or the provision of a [FAPE]" to such a student. § 1415(b)(6)(A); *see also* 8 N.Y.C.R.R. § 200.5(i)(1).  First, parents "who wish to challenge their child's IEP as insufficient under the IDEA may file a due process complaint, requesting an impartial hearing before an [Independent Hearing Officer] [("IHO")], appointed by the local board of education."  *Hidalgo v. Porter*, No. 21 Civ. 10794 (JGK), 2023 WL 8810276, at *2 (S.D.N.Y. Dec. 20, 2023) (citing *Walczak*, 142 F.3d at 122).  Either party may then appeal the IHO's decision to a New York State Review Officer ("SRO"), and the SRO's decision can be appealed to either state or federal district court.  *Id.* (citing *Walczak*, 142 F.3d at 122–23; 20 U.S.C. §§ 1415(g), 1415(i)(2)(A); and NY. Education Law § 4404(2)).

### B.  Tuition Reimbursement under the IDEA

"'Parents who . . . believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a 'due process complaint.'"  *M.O.*, 793 F.3d at 239 (quoting *Hardison v. Board of Education*, 773 F.3d 372, 376 (2d Cir. 2014)).  Parents who unilaterally place their child in a private school do so "at their financial risk*." Reyes ex rel. R.P. v. New York City Department of Education*, 760 F.3d 211, 215 (2d Cir. 2014).

The Supreme Court has established a three-pronged test—known as the *Burlington/Carter* test—to determine eligibility for tuition reimbursement. [1]  The test

---

[1] The *Burlington/Carter* test is named after two Supreme Court cases:  *School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts*, 471 U.S. 359, 370, 374 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7, 15-16 (1993).

looks to "(1) whether the school district's proposed plan will provide the child with a [FAPE]; (2) whether the parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities." *C.F. ex rel. R.F. v. New York City Department of Education*, 746 F.3d 68, 73 (2d Cir. 2014).

"Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing. If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184-85 (citing *Cerra*, 427 F.3d at 192).[2] The district court retains discretion over whether to award tuition reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added).

## II.    BACKGROUND

### A.  Factual Background[3]

A.S. is a twelve-year-old student diagnosed with Autism Spectrum Disorder, Attention Deficit/Hyperactivity Disorder, and Specific Learning Disorder with Impairment in Written Expression. Doc. 14-1 ¶ 1. During the 2021–22 and 2022–23

---

[2] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'" *Reyes*, 760 F.3d at 215 (internal citations omitted).

[3] The following facts are drawn from the certified administrative record, which was submitted to the Court in connection with the instant motion, *see* Doc. 13, and the undisputed facts in Plaintiffs Rule 56.1 statement, Doc. 14-1. The DOE did not submit a Rule 56.1 statement in connection with their cross-motion for summary judgement.

The Court also considers the exhibits that Plaintiffs attached in their reply brief. Docs. 17-1, 17-2, 17-3, 17-4. *See Grim v. Rhinebeck Century School District*, 346 F.3d 377, 380 (2d Cir.2003) (stating that courts reviewing IDEA cases must "tak[e] into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties").

school years, A.S.'s fourth and fifth-grade years, A.S. attended an ASD Nest program[4] at a DOE public school. *See* Doc. 14-1 ¶ 3; *see also* P. Ex. B at 1.[5]  During the 2023–24 school year, A.S.'s sixth-grade year, he attended a private school for which his parents now seek tuition reimbursement.  *See* Doc. 14 at 25.

### 1. A.S.'s 2022 IEP

In January 2022, the DOE convened a CSE to develop an IEP for A.S.[6]  P. Ex. Q at 1.  The IEP that was prepared lists A.S.'s academic performance based on diagnostic tests, in-class grades, and classroom assessments.  *Id.*[7]  According to classroom assessments, in reading and math A.S. was at "level 3" corresponding to at grade level, and for writing A.S. was at "level 2," approaching grade level.  *Id.* at 2–3.  The IEP notes that A.S.'s mother expressed concerns because "[A.S.] was above grade level in second grade

---

[4] According to the IHO, "the ASD Nest program is a partnership between [the DOE] and New York University's (NYU) ASD Nest Support Project.  The program serves students with autism and typically developing students in a reduced class-size Integrated Co-Teaching [] model."  IHO Decision at 5.

Further according to a September 2011 "ASD Nest Program Family Handbook" that Plaintiffs cite in their brief, *see* Doc. 14 at 16, the "ASD Nest Program is a ten-month program . . . the DOE has arranged for special education services for the summer on a case-by-case, year-by-year basis."  N.Y.C. DEPARTMENT OF EDUCATION., *ASD Nest Program Family Handbook*, Sept. 2011, 4 https://docs.steinhardt.nyu.edu/pdfs/metrocenter/al170/ASDNestFamilyHandbook.pdf (last visited March 20, 2026).

[5] Citations to "P. Ex." refer to parents' exhibits from the impartial hearing in this case; citations to "D. Ex." refer to the DOE's exhibits from the impartial hearing; citations to "Tr." refer to pages of the transcript of the impartial hearing; citations to "IHO Ex." refer to exhibits entered into the record by the IHO in the impartial hearing in this case; citations to "IHO Decision" refer to the decision of the IHO; and citations to "SRO Decision" refer to the decision of the SRO.

[6] The IEP was to be implemented on February 4, 2022.  P. Ex. Q at 1.

[7] Several diagnostic tests were administered for different subjects.  According to the Fountas and Pinell reading assessment, A.S. was reading at "level R."  P. Ex. Q at 1.  According to the Acadience Reading Assessments, A.S. was above grade level in September 2021 and at grade level in January 2022.  *Id.*  In math, A.S. was at "level 3" which corresponds to being at grade level.  Based on the i-Ready math data, in September 2021, A.S. was performing at grade three, and in January 2022, he was performing at grade four.  *Id.*

but [his] grades have regressed since remote instruction." The IEP then discusses A.S.'s social and physical development. *Id.* at 4–5

The IEP also describes feedback from external evaluations, including evaluation results from A.S.'s previous school concerning A.S.'s social emotional and academic development. *Id.* at 3. Further, the IEP discusses the results of a diagnostic psychiatric evaluation by the NYU Child Center in September 2020 as well as a subsequent evaluation in January 2021 that the parents sought privately. *Id.* at 4.

The 2022 IEP recommends that A.S. be placed in general education classroom and receive integrated co-teaching for math, English-language arts, social studies, and sciences. P. Ex. Q. at 17. The IEP also recommends that A.S. receive related counseling services once a week, occupational therapy twice a week, and speech-language therapy three times a week. D. Ex. 4 at 19.[8] The IEP states that A.S. is eligible to receive the following special education services during the summer months of July and August on a weekly basis: one thirty-minute session of counseling services, one thirty-minute session of occupational therapy, and three forty-five minute sessions of speech language therapy. *Id.* at 18–19.

The IEP's placement recommendation is "NYC DOE School Non-Specialized (District 1–32)." *Id.* at 22. The IEP indicates that A.S.'s promotional criteria is "standard." *Id.* at 24. Under the promotional criteria, the IEP highlights the concerns expressed by A.S.'s parents:

---

[8] The recommendations of weekly related services in the IEP are: one thirty-minute session of counseling service in a group of three; one thirty-minute session of occupational therapy in a group of two; one thirty-minute session of occupational therapy in a group of five; and three forty-five minute sessions of speech-language therapy in a group of five. P. Ex. Q at 17–18.

> At this time, [A.S.]'s parents have a concern regarding his academic and handwriting abilities. As for academics, [A.S.]'s parents have mentioned that [A.S.] works hard on areas when he is motivated to improve. When [A.S.] has a goal to improve, he will begin to work on it in the classroom. [A.S.]'s parents would like to see [A.S.] continue to maintain grade level work and improve on areas with support from his teachers and parents working together to help support him and guide him towards academic success.

P. Ex. Q at 24.

Finally, the IEP indicates that two other options for schooling were considered: a "General Education class with Related Services," which was "considered but rejected as they do not meet [A.S.]'s academic and social needs," and a "Special Class" in a community school which was rejected as "too restrictive at this time." *Id.* at 24–25.

### 2. Claims of Bullying During the 2022–23 School Year

During the 2022–23 school year, Plaintiffs argue that A.S. experienced multiple incidents of bullying of which the school was aware. P. Exs. J–P.[9]

On November 2, 2022, A.S.'s father emailed school officials and asked for the contact information for A.S.'s science teacher because A.S. "complained today about some bullying behavior with kids he shares a table with during science class. It didn't sound overly serious, but it did sound like it was impacting both his learning and his mood, and his eyes lit up when I asked if simply having him change tables would help." P. Ex. M. The following morning, the school official responded with the science teacher's name and email address. *Id.* At the impartial hearing, A.S.'s mother testified that after A.S. was moved to another table, his grade went up a bit, "because he was able to actually focus in that class." Tr. at 472.

---

[9] Two incidents identified by the in the email exhibits submitted by the parents occurred prior to the development of A.S.'s 2023 IEP. *See* P. Ex. K, M.

On January 26, 2023, A.S.'s mother emailed school officials about his IEP and referenced his previous physical injuries:

> [A.S.] has had issues with safety in the busy school environment.  One of [A.S.]'s challenges with where he is on the spectrum seems to be that he doesn't always realize where his body is in space . . . As you know, he has already been to the emergency room once when another child stomped on his hand and injured his fingers.  He also had a head injury when a child threw a water bottle at a different child and [A.S.] was "caught in the cross-fire" and had numerous more minor events throughout the year.  We are worried about this trend continuing into middle school when school will be larger and the kids themselves will be much larger and stronger, leading to more serious injuries.

P. Ex. C.

On Friday, January 27, 2023, A.S.'s mother emailed school officials that a school nurse called her because "[A.S.] was punched in the chest by another child during recess."  P. Ex. K.  In the email, A.S.'s mother stated that A.S. was not interacting with the other child at the time, and again referenced an injury that A.S. suffered that year when "another child stomped on his hand," and expressed concern about the school's learning environment.  *Id.*  DOE Counselor Chrisovalantou Chryssos-Lignos responded to the email stating that she spoke with A.S. about the incident, that another staff member spoke with the other student, and that the school would further investigate the incident the coming Monday.  *Id.*

On February 16, 2023, A.S.'s father emailed the school stating that A.S. was complaining about a student "being mean to him and 'making [him] miserable," and requesting that the school ensure this student did not sit next to A.S.  P. Ex. L. The next day, A.S.'s mother sent a follow up email, stating that this other student, "regularly kicks [A.S.] or his chair and trips [A.S.] when he is trying to walk. . . Today . . . [the other student] told [A.S.] he was going to 'make his day miserable tomorrow.'"  *Id.*  A.S.'s mother

9

stated, "Please make sure [the other student] is not near [A.S.], and is not in possession of any objects that could be used to hurt [A.S.]." *Id.* In a separate email about the same incident, A.S.'s mother stated "[A.S.] is experiencing both falling grades and increasing social challenges and rates of injury while at school." P. Ex. N. Though the record before the Court does not include a response, A.S.'s mother's testified at the impartial hearing that "we were able to bring [the issues] to the teachers and have [A.S.] reseated, or the teachers would talk to the [other] kid." Tr. at 472.

On May 11, 2023, Plaintiffs emailed school officials about an incident A.S. experienced during lunch that day. The email stated:

> . . . [A.S.] explained the lunch incident as:
>
> He was trying to rest with his eyes closed during lunch, when 4 kids came over and started bothering him, poking him, and pouring water on his head. He asked them multiple times to leave him alone and stop but they didn't. They took his mask and threw it away and also took his glasses. Then they made fun of him for not being able to see without his glasses and for not having his mask. He said that he eventually got his glasses back, but he wasn't able to explain how. Nor was he able to explain how a teacher got involved, or what the teacher['s] response was to the incident.
>
> Would you mind filling in the details about what exactly happened, and how the school is handling it?

P. Ex. O. Kristine Amato responded:

> Today as I was in the cafeteria during lunch I walked around and chatted with children as usual. . . . As the period progressed, I did see [A.S.] resting his head on the table and then laying on the bench. I was not concerned about seeing him sleeping because it's not unlike him to want a rest. . . .
>
> [A.S.], along with his other classmates transitioned from the cafeteria to the school yard as normal. Once outside I saw [A.S.] laying on the ground. That is not typical of him so I went over, bent down and said hey [A.S.], are you okay buddy? He looked at me and said do I look okay? I said no, this doesn't seem like you that's why I'm here. I wanted to make sure that you are okay. He then said that he just wanted me to go. I said to him that I was concerned, then asked if something happened to him. He then told me a boy from his class took his

10

glasses and understandably he was upset.  I told him that I was going right now to talk with the boy and reminded him that at any point he can tell me if he is ever uncomfortable, being bothered or needs help.  When he was laying on the bench in the cafeteria his glasses were on and then he had his head down on the table in his arms so I couldn't see that his glasses were off.

I went over and spoke with the other child.  He immediately became emotional and states that he didn't mean to make [A.S.] upset. . . .

We spoke about appropriate play and ways to engage.  Touching and taking someone's personal property is taking it too far and doesn't come off as playing. The boys talked together very nicely and cleared up what happened.  His classmate authentically apologized and said he won't do it again.

At that moment [A.S.] mentioned to me that some girls were bothering him too. He told me that they were touching his hair, tickling, and poking him.  He told me who the girls were and I called them over to hear what happened . . .

The girls mentioned that they thought he was playing.  They mentioned how he sometimes plays dead they sneak up and or poke and tickle him and he jumps up at them.  [A.S.] agreed that they have played a game like that before.  He then said that this time he wasn't playing though and wanted to sleep.  He said that he told them that he wanted to sleep and they didn't listen, they continued to try to get him up.  Two of the girls admitted that they poured a cup of water on his hair to try and get him up too.  I immediately talked about when someone talks and expresses how they are feeling or to stop you need to listen.  It is not a joke. . . . [A.S.] openly expressed to the girls how he felt and what he didn't like.  The girls heard him and all individually apologized. . . .

As soon as I left his class I met with one of the behavioral specialists to inform her of what happened.  A behavioral referral was written and submitted to the behavioral support team.  The team will follow through with the behavioral protocol moving forward. . . .

P. Ex. O.[10]

On May 30, 2023, Kristin Martinosky, a special education math teacher, emailed

A.S.'s parents detailing that A.S. "accidentally walked into a student who was playing

---

[10]  Between Monday May 15 and Wednesday May 17, 2023, A.S. stayed home as he was not feeling well. A.S.'s mother emailed school officials each day and stated that she was "concerned that what [A.S.] is feeling is anxiety about going back to school after being harassed by the group of students who stole his glasses last week."  P. Ex. P.

with a jump rope during recess," that he had a "small red spot on his thigh," and that A.S. "said he was okay." P. Ex. J; *see* IHO Decision at 2.

At the independent hearing, A.S.'s mother summarized many of the incidents above. Tr. at 470–473. When asked if A.S. experienced any bullying, his mother responded:

> I mean, [] I would say so. He experienced a lot of things, everything from just running into people or objects, to certain kids just going after him, day after day. There were some cases where he would allude to something, you know: I really hate this class; there's a mean kid. And we would, eventually, tease out of him something that sounded like bullying to us, that teachers weren't reflecting back to us. . .

Tr. at 471–72.[11] When asked if "the school ever investigated any of [A.S.]'s incidents with other students," she responded:

> It was a real mixed bag. So sometimes [A.S.] would come home with a note from the nurse, in his backpack. And he couldn't fully articulate any of the details to us. And the school didn't seem to know too much. Or sometimes, we'd get a call from the nurse and get some of the story.
>
> There were a couple of instances where, I think, the school made much more of an effort. . . .
>
> But that's, you know, I could maybe count on one hand the times when the school followed up. But there were just many sort of out the blue, come get your kid,

---

[11] At the impartial hearing, when asked how A.S.'s autism impacts his day-to-day, A.S.'s mother responded:

> So autism can make it challenging for [A.S.] to understand what someone is conveying, [] to read a facial expression, to read between the lines, and to sort of position himself socially. . . . At least last year, he was working to figure out how to avoid bullies[]: How do I make sure that I walk in a way and put myself in a way that I don't cross paths with someone I'm not comfortable around? . . .
>
> He also, just in general, his orientation in space [] and where is my body relative to other moving objects, other things coming toward me, is a big challenge for him. And so, in an environment that's very busy with a lot of people and things moving around, he can't always keep his body safe. And he also can just have sensory overwhelm and shut down. . . .

Tr. 465–466.

you know, he is hurt.

Tr. 473–75.  When asked if the "school ever contact[ed] [her] about the results of any

such investigations," she responded:

> Like I said, I think, in particular with the group of kids pouring water on his head,
> I think that was one where they did get back to us, that they had the kids apolo-
> gize, and they even had something in writing.
>
> In the [] science classroom, there wasn't any follow up.  But I think they just tried
> to seat the kids farther apart.  Yeah, the [] vast majority there wasn't follow up, or
> we weren't even always notified what was going on, until we got it out of him.
> But there [] were some cases where there was [follow up].

Tr. 474–75.  When describing A.S.'s experiences at the Nest school during fifth grade,

she testified:

> In the 5th grade year, . . . [A.S.'s academic] slide, unfortunately, continued in a
> big way.  So he lost pretty much another grade level, to where he was at 2s in
> many subjects, and [] his first 1s.  And the injuries just became more frequent, to
> where, by the end of the school year, I was having to dash out of work, you know
> almost weekly, to come get him, because the school nurse would call and say:
> [t]his happened; that happened; he needs to be picked up.  He was having a lot of
> anxiety around school, so he would also complain of stomachaches constantly and
> sometimes would be sent home from school for that.
>
> Just his [] attitude toward himself was very negative . . . in the beginning, he was
> like:  Oh this school . . . I really don't like my teachers; I don't like the classes.
> By the end of 5th grade, he was just:  I'm an idiot; I can't do it; I can't have
> friends; nobody will like me.

Tr. 468–470.[12]  When asked if the Nest program was appropriate for A.S., she responded:

"I thought it was [inappropriate] . . . He was not able to learn, and he was not—he was in

---

[12] When describing A.S.'s fourth grade experience at the Nest school, A.S.'s mother testified:

> [I]n 4th grade, he started in the Nest program, in person.  And [] that was where he started to
> struggle to keep up academically on grade level.  He started earning 2s for the first time, and he
> also started to express to us a lot of unhappiness, resistance to going to school.  I had to put a lot of
> carrots and sticks in place, just to get him on the bus in the morning . . . And also, we started see-
> ing some challenges with injuries in the school environment, more than that had happened a bit in

physical pain.  He was being hurt all the time.  And [] it was affecting him emotionally.

It was affecting his self-confidence.  And [] it was affecting his grades." Tr. 498–99.

At the impartial hearing, Chryssos-Lignos, testified that these incidents did not

qualify as bullying, but rather as conflicts, with the other students:

> At the end of the day, if a student is being bullied, it's happening by one other person repeatedly or a group of other students repeatedly.  As I pointed out previously, . . . these conflicts were happening with multiple different students, and some of them were, case in point, accidents.  Others were intentional and those were written and taken care of, and parents were notified.
>
> However, no, I don't see any of this being purposefully towards [A.S.] by one specific [child] or group of children.  If he has conflicts with them, that's one thing, but it is not bullying.

Tr. at 284–85.

### 3. A.S.'s 2023 IEP and Decision to Attend the Lang School

Prior to the 2023 CSE meeting, on January 26, 2023, Plaintiffs sent an email to

several of A.S.'s teachers and the "IEP team," stating:

> As you know, [A.S.] is on a very steep academic decline.  Since he started in ASD Nest, his grades have fallen from a mix of 3's and 4's prior to entering Nest, to a mix of 2's and 3's last year, and now a mix of 1's and 2's this year.  He's losing an entire grade point average per year.
>
> . . .
>
> [W]e have decided to have A.S. re-evaluated with a psychiatrist.  We are hoping they will be able to advise us on his current needs in terms of academic environment, support safety, etc. . . . We will receive the results of the evaluation on April 7th. . . . We are still happy to go forward with the Feb 8th IEP meeting, cognizant that your questionnaire and March neuropsych[iatric evaluation] could point to additional needs and we will need to schedule another IEP meeting afterward.  Let's please plan to meet again in the April 10-21 window to revise his IEP again according to his latest evaluation.

---

the beginning of 2nd grade [A.S.'s last in person school] . . .

Tr. 469.

> In the meantime, we can see what we can do on February 8th to identify how [A.S.]'s needs can be better met based on what you have already told us. To summarize, in our [parent teacher conference] earlier this year, every single teacher told us that even though [A.S.] is behind grade level in every subject this year, he is extremely bright and capable of understanding the material, but he is bored and failing to become engaged in school. . .
>
> On our side, we have attempted to encourage [A.S.], give positive incentives for trying hard to stay engaged, and provide as much outside support as we can . . . We are concerned that there is a serious mismatch between what our child needs to learn effectively, and the setup of his academic environment. . . . Alarmingly, we are even seeing emotional consequences of this mismatch, including falling self-esteem and more resistance to going to school, which is moving in the direction of outright refusal. We worry that the academic mismatch is working in opposition to all the efforts of [A.S.]'s social and emotional supports in the Nest program.

P. Ex. C. According to A.S.'s mother's testimony at the impartial hearing, the school responded by "acknowledg[ing] that they got it, thank[ing me] for raising this, and [stating that they'd] talk about it at the IEP meeting . . . " Tr. at 485.

On February 8, 2023, the DOE convened a CSE to develop an IEP for A.S.[13] *See* IHO Dec. at 6. The CSE was composed of: special education reading teacher and DOE representative Belkys Carmona, general education math teacher Pauline Angelinas, occupational therapist Marisa Davidson, counselor Chrisovalantou Chryssos-Lignos, speech therapist Debbie Stamos, special education math teacher Kristin Martinosky, and A.S.'s mother. *See* D. Ex. 4 at 28; IHO Decision at 2.

The IEP that was prepared begins by listing A.S.'s reading, writing, and math levels based on diagnostic tests, in-class grades, and classroom assessments. With respect to academic performance, according to the Fountas and Pinell reading assessment performed in January 2023, A.S.'s level was "S," corresponding with being "[i]n the 5th

---

[13] The IEP was to be implemented on March 2, 2023. D. Ex. 4 at 1.

grade range," D. Ex. 4 at 1. According to the middle-of-year Acadience Benchmark, A.S.'s "words correct decreased indicating he read less words and the retell quality also decreased. In the Maze he scored at/above grade level." *Id.*[14] Based on classroom assessments, in writing and reading, A.S. was approaching grade level, and for math, A.S. was at grade level. *Id.* at 2–3. With respect to his academic development, the 2023 IEP states that A.S.'s mother "expressed she is concerned because [A.S.] is not currently on grade level. She requested information on additional services to help [A.S.]." *Id.* at 4. The IEP subsequently repeats the parents' academic concerns expressed in the 2022 IEP: observing A.S. was not performing at grade level, requesting information on additional services to help A.S., and stating that they hoped to see his academics improve with support from both teachers and parents in collaboration. *Compare* D. Ex. 4 at 4 *with* P. Ex. Q at 24.

The IEP next lists A.S.'s social development, describing that he is able to participate in all age-appropriate school activities, that he has difficulties initiating conversations at times, and sometimes requires cues from an adult to understand turn-taking in conversations. D. Ex. 4 at 4–5. The IEP notes that "[A.S.]'s parents have not expressed any concern in regard to his social development." *Id.* at 5.[15] At the impartial hearing, when asked if the IEP addressed any of the concerns regarding issues of injuries

---

[14] The IEP's evaluation results section also lists two scores for "i-ready Diagnostic," one which lists A.S. as at the fourth-grade level, and one which lists him at the fifth-grade level.

[15] It is unclear which DOE witness wrote this line. When asked, Chryssos-Lignos responded: "That's not something I wrote, so that's not something I could speak to." Tr. at 294. When questioned as to who would have written that portion of the IEP, she responded, "I guess whoever finalized the IEP, the person in charge of it, which I, from what I recall, is Ms. Belkys [Carmona], the special education teacher for [A.S.] at the time. But we'd have to look into the [system] to see who finalized it, who opened it." *Id.* at 295.

When Belkys Carmona, a DOE special education reading teacher, was questioned, she responded "I don't recall." Tr. at 370.

or alleged bullying, both Pauline Angelinas, a general education math teacher, and Debbie Stamos, a DOE speech therapist, indicated that they could not recall. Tr. at 50, 170; *see* IHO Decision at 2.

With respect to A.S.'s physical development, the IEP states that A.S. can participate in all age-appropriate school-related activities, and that his occupational therapy sessions focus on sensory processing, executive functioning, and fine motor and visual motor skills. D. Ex. 4 at 5–6. The IEP notes that that A.S.'s parents wanted A.S. to be evaluated for physical therapy needs in school. *Id.* at 6.

The IEP listed "measurable annual goals" for the upcoming calendar year. *Id.* at 8–18. The IEP recommends that for math, English-language arts, social studies, sciences, music, and technology, A.S. be placed in a general education classroom and receive integrated co-teaching. *Id.* at 18–19. The IEP also recommends that A.S. receive related counseling services twice a week, occupational therapy three times a week, and speech-language therapy three times a week. *Id.* at 19.[16] Further, the IEP indicates that A.S. is eligible to receive the following special education services during the summer months of July and August on a weekly basis: one thirty-minute session of counseling services and one thirty-minute session of occupational therapy in a group of five. D. Ex. 4 at 20.

The placement recommendation in the 2023 IEP is the same as in the 2022 IEP and reads: "NYC DOE School Non-Specialized (District 1-32)." *Compare* D. Ex. 4 at 25 *with* P. Ex. Q at 22. The promotional criteria in the 2023 IEP is identical to that in the

---

[16] The recommendation of weekly services in the IEP are: one thirty-minute session of counseling service in a group of three; one forty-minute session of counseling service in a group of three; one thirty-minute session of occupational therapy in a group of two; one thirty-minute session of occupational therapy in a group of five; one forty-minute session of occupational therapy in a group of five; and three forty-five minute sessions of speech-language therapy in a group of five. D. Ex. 4 at 19.

2022 IEP: A.S.'s promotional criteria is "standard"; both a "General Education class with Related Services" and a "Special Class" in a community school were considered and rejected; and parents expressed concerns with respect to his academic performance, his academic motivation, and his handwriting abilities. *Compare* D. Ex. 4 at 27 *with* P. Ex. Q at 24.[17]

> When describing the CSE meeting itself, A.S's mother stated:
>
> And I said, you know, I just want you to know that I have two big things that I'm really concerned about, and it's [A.S.]'s physical safety in school, [] with these injuries, and his academics, where he's losing almost a grade average every year. And we really need resources.
>
> And so they [] took over the meeting and just did the boilerplate thing, going through the IEP. And at the end of the meeting they said: Do you have any concerns? And I said yes, it's those same two concerns; can you please give us any resources.

Tr. at 482–83. A.S.'s mother stated that at the CSE:

> We thought maybe for the injuries [the school] could offer [A.S.] [] physical therapy. We know that was something that they had in the school . . . And they did an evaluation really soon after that meeting and got back to us and said that he did not seem eligible for that service.

*Id.* at 482.

After the development of the 2023 IEP, A.S. was given a neuropsychological evaluation at NYU over five days in March and April 2023. P. Ex. B at 1. The evaluation report includes test results and qualitative analysis of A.S.'s cognitive functioning, his academic progress across multiple subjects, his neuropsychological domains, his behavioral ratings, as well as his social communication. P. Ex. B at 18–19.[18] Further,

---

[17] The concerns of A.S.'s parents highlighted in the promotional section of the 2023 IEP are also identical to those in the academic development section of the 2023 IEP. *Compare* D. Ex. 4 at 4 *with id.* at 27.

[18] Though the evaluation report is not dated, it states that the "feedback session" occurred on April 7, 2023. P. Ex. B at 1.

the report recommends "that [A.S.] be placed in a program explicitly designed to support his uneven and highly nuanced intellectual, educational, behavioral, and social-emotional needs and that he continue [to] receive his existing complement of related services along with continued psychotherapy, additional support for executive function skill development, and evidence-based programming to support his socialization." *Id.* at 19–20.

When asked if the results of the April evaluation were shared with the school district, A.S.'s mother responded: "I don't think it was shared with the public schools, because it took them a while to [complete] the evaluation. . . . And I think by that time [] it was this spring. We had already had this IEP meeting." Tr. at 496. When further asked if she ever requested that the CSE reconvene to do another IEP after the additional testing, she testified: "No. [] Generally, I don't think we've ever requested an IEP meeting. Generally, we get a date scheduled by somebody." *Id.* at 497. Though no CSE meeting occurred after February 8, 2023, the members of the CSE and additional district staff joined the parents in a parent-teacher conference, which A.S.'s mother described as "basically . . . a repeat of [A.S.]'s IEP meeting." *Id.* at 497–98.

According to the mother's testimony at the impartial hearing, during the spring of 2023, she explored open houses at other Nest middle and high schools. She testified:

> We spent a lot of time investigating options. We [] received a lot of open house notifications, attended a lot of open houses for schools in the public schools. And the [] Nest program actually continues into middle and high school, so we were looking at Nest middle schools and [] visiting and talking to other Nest parents. And it [] just was clear that it was going to be a continuation of the problems, maybe worsening of the problems that [A.S.] was having. And so we [] at that point, [] just realized that we had run out of options and needed an alternative.

19

*Id*. at 488.  When asked to describe her anticipated problems with the Nest schools, A.S.'s

mother responded:

> Sure.  So you know [] we visited each school thinking about the physical
> environment of the school, the number of kids, [] just kind of [the] amount of
> sensory input that happens in these environments.  Of [] the schools I listed, one is
> a middle school, but it is actually four middle schools with four principals all in
> one building.  So it's very, very hectic and busy.  Two, actually, are middle and
> high school, and the middle and high schoolers share a lunch room.  So you've
> not only got middle school-sized kids, but also high school-sized kids.
>
> And then one is a middle and elementary school.  And so that one, some of the
> kids are smaller.  But that school, it [] was just so many bodies.  The [] kids are
> just packed into every corner . . . And it was just clear that my son wasn't [] going
> to be able to navigate [] that space.
>
> And I think just seeing [] so many kids who are a lot bigger.  And you know, my
> son had been punched by a kid.  He had stuff thrown at his head and hit him in the
> head.  He'd been stepped on.  He'd been tripped.  He'd been on and on and on.
> And thinking about [] him in [] those environments would be similar, if not more
> hazardous compared to where he was at the time.

*Id.* at 518–20.

When asked if she received a timely placement notice from the CSE following the

February 2023 meeting, A.S.'s mother responded:  "I'm not sure that I did.  We did

receive a letter of admission from a middle school in the Nest Program, so we knew that

there was a spot for him, but I don't think we received a timely placement notice."  *Id*. at

490.

When the IHO asked "[i]f the CSE had offered you a program and placement that

you would have considered appropriate for [A.S.] would you have been open to sending

him there?" A.S.'s mother responded:  "Yeah.  Definitely.  I mean, if he could have

continued in the public schools but in an environment that he could learn in, that would

have been the perfect situation."  *Id.*

20

Ultimately, Plaintiffs decided to enroll A.S. in the Lang School for the 2023–24 school year.  *Id.* at 487.[19]

## A.  Procedural Background

### 1.  *Due Process Complaint*

On August 15, 2023, Plaintiffs filed a due process complaint challenging the DOE's IEP and seeking tuition reimbursement for A.S.'s 2023–24 school year at the Lang School.  P. Ex. A.  Plaintiffs allege that the DOE failed to offer A.S. a FAPE for the 2023–24 school year on both procedural and substantive grounds.  *Id.*  The due process complaint claims that, among other things, the DOE ignored Plaintiffs' input and available evidence and implemented a predetermined and inapplicable plan; the CSE team was "improperly composed as it lacked, inter alia, properly qualified special education and regular education teachers";  the IEP did not include up-to-date testing of A.S.'s academic or socioemotional functioning, including a triennial evaluation; the DOE wrongfully failed to revisit the IEP after A.S.'s independent neuropsychiatric evaluation in April 2023; and the DOE is incapable of providing the services proposed by the IEP.  *Id.* at 1–3.

### 2.  *The Impartial Hearing*

An impartial hearing occurred over five days before IHO Keegan Staker:  January 18, 2024; February 26, 2024; March 4, 2024; March 18, 2024; and April 12, 2024.  IHO Decision at 3–4.  The DOE called five witnesses:  DOE speech therapist Stamos, special education math teacher Martinosky, general education math teacher Angelinas, DOE

---

[19] A.S.'s parents entered a contract with the Lang School on February 13, 2023, for the 2023–24 school year.  P. Ex. E at 18.

counselor Chryssos-Lignos, and DOE special education reading teacher Carmona. *Id.* at 2. Meanwhile, Plaintiffs called three witnesses: A.S.'s mother, Lang School director of clinical services Judy Nussbaum, and Lang School teacher Seth Consigli. *Id.*

Plaintiffs argue that legal violations threatened the integrity of the impartial hearing. Doc. 14 at 19. Specifically, they assert that the IHO permitted the DOE to "engage in delay tactics" and to "drag proceedings out by numerous months"; impermissibly allowed the testimony of Carmona and Chryssos-Lignos, despite their late disclosure; "went so far as to answer questions for, and testify for, the DOE witnesses"; and allowed the hearing to proceed "against the backdrop of [the] DOE counsel's pervasive unprofessionalism." *Id.* at 19–21. The Court examines the relevant factual evidence.

### a. *Adjournments of Hearing Dates*

On Friday, December 1, 2023, six days prior to the date the impartial hearing was scheduled to start, counsel for the DOE emailed the IHO and Plaintiffs' counsel requesting an adjournment:

> I'm reaching out as it seems I have to request a short adjournment.
>
> I was assigned this case on Monday and advised of the quick hearing date coming up . . .
>
> I was able to confirm our witnesses, but the day of the hearing is a school wide conference day. They've attempted all week to work out coverage for classes and the like, but with the half day it wasn't possible, and they've confirmed this morning they can't appear on this day. (I gave them today as the deadline to figure it out so I could disclose timely).
>
> I can squeeze the district[']s case into my calendar the following week, or week after to avoid a lengthy delay . . .

Doc. 17-2 at 1. DOE's counsel provided availability for seven dates between December 11, 2023 and January 18, 2024. *Id.* at 1–2.

22

The IHO responded about an hour later stating: "The adjournment is granted to a date TBD." *Id.* at 1. Subsequently, Plaintiffs' counsel responded:

> With all due respect, we vehemently oppose this adjournment, which would unduly prejudice our client (as well as, we expect, your demanding schedule). There are numerous reasons to reject the DOE's late-stage, inequitable adjournment request.
>
> First, and as a preliminary matter, the purported reason for the DOE's request—witness availability—is improper because the DOE failed to meet the deadline for disclosing witnesses: disclosures were due yesterday, and no witnesses were listed in DOE's packet then . . .
>
> Second, you properly set the hearing date over a month ago in October; there was no reason for the DOE to sit on this issue until now . . .
>
> Third, unlike the DOE, the [Plaintiffs] acted promptly to secure witness availability. We are prepared and ready to go on December 7th, and given the upcoming holidays and school closures for the winter break, rescheduling will be difficult and will cause undue delay. . .
>
> And finally, the DOE is a repeat-player in these cases—granting them leeway in their hurry-and-wait approach without due justification here will reward improper behavior and encourage it in all other cases . . .

Doc. 17-3 at 4–5. The IHO responded:

> My apologies for acting without hearing from [Plaintiff's] counsel. I wrongly assumed your office would support the extension given your office['s] hesitance to agree to schedule hearings in the first place generally. That said, I acted without realizing that DOE has disclosed late. Given the DOE's late disclosures in this matter, which will lead to preclusion upon a proper record made, there is no need to adjourn on the basis of DOE's witness availability. We will proceed [on December 7th] as scheduled.

*Id.* at 4. The DOE counsel responded stating that the DOE timely disclosed its witnesses and evidence on December 1, 2023; that the witnesses are IEP team members, so Plaintiffs should not be surprised by their inclusion; that they are offended by the insinuation that the request is a "trick to delay"; that their request is "not unreasonable under the circumstances"; and that DOE counsel provided alternative times beginning the following week. *Id.* at 3. The IHO responded:

> I have absolutely no doubt that your request for an adjournment was sincere and based on scheduling issues, and I agree that insinuations to the contrary are

23

wholly inappropriate.  But for the late disclosures, I would have had no problem granting the adjournment . . . I strictly adhere to the five-business day disclosure rule, because a rule that is not enforced is not a rule at all.  12/1 disclosures, were, unfortunately, one day late.  While I very much welcome the [DOE] to properly defend these cases, and have heard them on the merits, in this case, that will not be possible . . .

[Plaintiffs' counsel], given your strong preference to go to hearing in your cases, please ensure that your office is prepared to schedule the remaining 19 cases on my docket when we meet on the 15th.

*Id.* at 2–3.  Plaintiffs' counsel responded:

Thank you, IHO.  For the record, and you noted, we would have been very willing to put off the hearing in this case before a hearing date was formally set in October.

But once the hearing date was set . . . we put in a great deal of work to secure witness availability in the rush before winter break and prepare them for the hearing as set for December 7th.

**This respect for the IHO's calendar, once dates are set, has zero bearing on our remaining cases, for which dates have not yet been set—and we are gravely concerned by the suggestion that our respect for a hearing date already set by your office in one case might be used to push our other cases to hearing.  That is prejudicial to our other clients and would seem to encourage all parties to flout IHO orders on hearing dates going forward.**

Finally, my email was not aimed at [DOE counsel] individually, but based on our years of litigating against the DOE, which due to its disorganization and staff retention issues, has historically caused many of our hearings to become unnecessarily delayed . . .

*Id.* at 3 (emphasis in original).  The IHO responded:

This is the first time that I've encountered the argument that scheduling a hearing, as requested by [Plaintiffs] in a Due Process Complaint, is prejudicial to the [Plaintiffs].  Noted.

I would also note that your office requested an adjournment of a scheduled hearing in another matter on this docket, which I granted.

*Id.*

On December 5, 2023, the IHO emailed the same thread, stating that both parties

had violated disclosure requirements:

I am reviewing our prior correspondence in this matter, and I note that [DOE Counsel] provided written disclosures on 11/29 not 12/1.  That email is attached.  The written disclosures are therefore timely as far as I can tell.

24

> On 12/1 [DOE counsel] supplemented [their] disclosure to include the following witness list: [Angelinas, Martinosky, Belkys, Stamos, Marisa Davison, and A.S.'s mother].
>
> [Plaintiffs] timely provided written disclosures on 11/30 and disclosed witnesses as follows:
>
>> Parent; Lang School classroom teacher(s);  Lang School administrator(s); related service provider(s); therapist, neuropsychologist evaluator, school psychologist.
>
> The Pre-hearing Conference Summary and Order provides for the following:
>
>> *7. A witness list shall be provided and must include the name and title of the witnesses and a brief, but informative description of the nature of the witness's testimony . . .*
>>
>> *8.  Disclosure of exhibits and witnesses lists will occur 5 business days before the scheduled hearing date . . .*
>
> Thus, I find that both sides have failed to comply with the disclosure requirements.  We will address this on the record on 12/7, unless [Plaintiffs' counsel] agrees to the DOE's request for an adjournment.

Doc. 17-4 at 2 (emphasis in original).

The DOE did not appear at the December 7, 2023 status conference.  Tr. at 2. [20] At the conference, the IHO began stating that the IHO and Plaintiff's counsel, "had an off-the-record conversation" in which they looked to the DOE's email adjournment request and "have agreed off the record to schedule this hearing for January 18th at 9:30 am." *Id*. at 3.  After Plaintiff's counsel confirmed that they had nothing to add for the record, the conference was adjourned. *Id.* at 3–4.

On January 18, 2024, at the end of the first day of the impartial hearing, the parties discussed the next hearing date. *See Id*. at 193–203.  The IHO began by stating that his next availability was February 26 and 28, 2024. *Id.* at 193.  Given the number of witnesses remaining, the IHO requested dates on which the parties were available for several

---

[20] Plaintiffs' brief states that "the hearing date [was] converted to a status conference."  Doc. 14 at 20.

hours. *Id.* at 200–01. The DOE counsel provided limited availability in late February and more availability in March. *Id.* at 197–202. Parents counsel indicated they were available for that date but objected that "we are bringing this hearing that was supposed to be scheduled and completed in December all the way to mid-March now." *Id.* at 203. Ultimately, the DOE continued presenting its case on February 26, 2024, and in part on March 4, 2024; while Plaintiffs presented their case in part on March 4, 2024 and on March 18, 2024. SRO Decision at 10.

### b. *The Addition of Carmona and Chryssos-Lignos as DOE Witnesses*

At the end of the first day of the impartial hearing, the parties and the IHO discussed DOE's request to add two witnesses to its witness list: Carmona, who the DOE argued was "the [English-language arts] teacher for [A.S.] . . . [and] she directed most of the [IEP] meeting,"[21] and Chryssos-Lignos who could respond to Plaintiffs' claims of bullying. Tr. at 177–178. The IHO began by stating, "I'm not inclined to amend the witness list." *Id*. at 178.

With respect to Carmona, the DOE argued that there was no prejudice in calling her as she was a member of the IEP team, and further, as the impartial hearing was already set to continue on another date, there would be no added delay. *Id*. at 181–82. Meanwhile, Plaintiffs objected to Carmona's addition, as she was not disclosed five days in advance and waiting for her testimony could cause additional delays. *Id*. at 180–81, 184–85. The IHO concluded, "I agree that [the DOE] did not disclose [her]. However, I

---

[21] Further, at the impartial hearing, the DOE stated that Carmona was on their initial witness list, but due to a mistake was not included on their amended witness list. Tr. 183–84.

find that there's no prejudice in calling the person who is responsible for convening of the IEP team. So I will allow her testimony provided that she is available." *Id*. at 185.

With respect to Chryssos-Lignos, the DOE argued that she was necessary to rebut Plaintiffs' claims of bullying, and Plaintiffs argued that the disclosure was untimely. *Id*. at 187. As the hearing continued, Plaintiffs observed that the issue of bullying was unexpectedly contested and that they had additional email records to substantiate their arguments. *Id*. at 192 ("We simply did not think that [bullying] would be disputed or denied. I mean, if the DOE wants to amend its witness list and add new witnesses, we are happy to amend our disclosure with all of those emails."). Ultimately the IHO stated that he was "in favor of a full record" and decided that Plaintiffs could introduce additional email evidence of bullying into the record, and the DOE could offer Chryssos-Lignos's testimony. Tr. 193. ("I am in favor of a full record. So, if you want to put in emails, that's fine. And of course, then we'll have a full record with the counselor [Chryssos-Lignos] providing her testimony on the issue.").

### c. IHO Answering Questions for the DOE

Plaintiffs argue that the IHO "went so far as to answer questions for, and testify for the DOE." Doc. 14 at 20. The Court examines the two instances highlighted by Plaintiffs.

First, when Plaintiffs' counsel asked if they could "ask [Stamos] for more clarification," the IHO responded "Yeah. And of course, this is the first progress report for the IEP, right?" before allowing Plaintiffs' counsel to proceed with questioning. Tr. at 77–78.

27

Second, when Plaintiffs' counsel questioned Chryssos-Lignos about the IEP, the IHO interrupted:

| | |
|---|---|
| [Plaintiffs' counsel]: | Where are these social issues reflected in the IEP? |
| Chryssos-Lignos: | It would be in the . . . social development section |
| [Plaintiffs' counsel]: | I have looked in the social development section . . . and don't see them.  Can you please identify where they are or read them? |
| | . . . |
| Chryssos-Lignos: | So [] actually in my counseling section, in the [] third paragraph, it states, in counseling [A.S.] is kind, friendly and adheres to behavioral expectations.  [A.S.] has difficulty . . . |
| [Plaintiffs' counsel]: | Okay.  Earlier we heard you discussing the social issues that he lacked social awareness, [] which you said led to injuries and conflicts.  Where is that in the IEP? |
| IHO: | Well she said in the paragraph before where it says [A.S.]'s physical activity can, at times, interfere with his social interactions. |
| [Plaintiffs' counsel]: | Right.  I mean, more the social awareness concerns.  They justified his injuries and said they were due to his uniqueness.  So I'm trying to figure out where that is and where that's addressed in the IEP. |
| IHO: | It says, for example, he may have difficulty maintaining the appropriate amount of personal space. |
| Chryssos-Lignos: | Precisely . . . |

*Id*. at 290–92.

   d.  *Unprofessionalism*

Finally, Plaintiffs argue that the hearing proceeded "against the backdrop of DOE counsel's pervasive unprofessionalism."  Doc. 14 at 21.  In particular, Plaintiffs highlight four instances.  The first concerns a discussion between the parties about the emails describing alleged bullying:

| | |
|---|---|
| [Plaintiffs' counsel]: | Ms. Martinosky wrote an email with Ms. Angelinas signing it, saying that [A.S.] had been injured.  They observed him– |

| [DOE counsel]: | (interposing) That's not in evidence.  And when asked about it– |
| [Plaintiffs' counsel]: | Please, I let you speak.  I did not interrupt. |
| IHO: | That's correct. |
| [Plaintiffs' counsel]: | I will also note– |
| [DOE Counsel]: | (interposing) That's fair. |
| [Plaintiffs' counsel] | – to watch your tone as the parent is on this hearing . . . |
| [DOE counsel]: | Did you just check my tone, ma'am? |

Tr. at 191–192.

Second, when discussing the Lang School's upcoming tuition schedule and Plaintiffs' desire to schedule the next impartial hearing date promptly:

| [Plaintiff's Counsel]: | That is just how the school is structured in terms of payments.  We don't have any control over how they charge tuition. |
| IHO: | Yeah. |
| [Plaintiffs' counsel]: | They have to sign– |
| [DOE's counsel]: | (interposing)  The [DOE] has no control over that either. |
| IHO: | Please, please– |
| [Plaintiffs' counsel]: | Please let me– |
| IHO: | –stop, [Plaintiffs' counsel] |

Id. at 203–204.

The third instance involved DOE's counsel's objection to a question that Plaintiffs' counsel asked:

| IHO: | [Plaintiffs' counsel], what's the [] relevance to this case? |
| [Plaintiffs' counsel]: | Well, she explained earlier that bullying has to do with the power imbalance between the victim and the bullier.  And I'm trying to get to understand how that inequality plays into determination of bullying. |
| [DOE's counsel]: | I would object to that characterization.  She did not explain the difference or the definition.  She simply read the definition and gave us the site to where she got it from.  At some |

29

> point since that time, one of [Plaintiffs'] two attorneys could have pulled it up on Google.

[Plaintiffs' Counsel]:  IHO, the [Plaintiffs]–

IHO:  (interposing) [DOE counsel], please dial it down a little, please.  I don't find the question to be relevant. . . .

*Id.* at 288–89.  Similarly, at another point in when DOE counsel objected stating: "That question calls for speculation . . . ," the IHO responded:  "Yeah, yeah, yeah, yeah, yeah.  Please, please [DOE Counsel] just state the objection and then [] stop.  Okay?  I mean we can move through this quicker.  The objection is sustained." *Id* at 296.

### 3.  *IHO's Findings*

IHO Staker issued a forty-page findings of fact and decision on May 22, 2024.  IHO Decision a 1–40.

With respect to allowing DOE witnesses Carmona and Chryssos-Lignos to testify, the IHO wrote:

> Following the testimony of [Stamos, Martinosky, and Angelinas] there was an extended conversation in which I granted the DOE permission to amend their witness list and call two additional witnesses to testify.  The first witness, DOE District Representative [Carmona], served as the district representative for the IEP meeting and was initially disclosed in a witness list, but was removed from DOE's amended witness list.  As the witness appears on the IEP, I found that there was no prejudice to Parent and granted leave to amend the witness list to include . . . [Carmona], who also served in the role of District Representative at the IEP Meeting.  With respect to the second witness, DOE Counselor [Chryssos-Lignos], [the] DOE argues that the witness is necessary as a rebuttal witness to [Plaintiff's] allegations of bullying, which denied [A.S.] a FAPE.  Though [Plaintiffs] initially objected to this addition, they agreed to the witness in exchange for the opportunity to supplement the record with additional evidence of bullying, which I granted.

IHO Decision at 3–4.  With respect to the credibility of the witnesses, the IHO found that:

> [T]he testimony of the five witnesses on behalf of the DOE, as well as the three witnesses on behalf of the parent [is] genuine and credible in all respects.  It is apparent to me that all witnesses had [A.S.]'s progress and education as their primary concern in their interactions with him.  I find [A.S.'s mother] to be a caring and attentive parent, seeking the best for their child.  I find that his teachers and

30

service providers for the 2022–2023 school year who testified as part of his IEP team to be dedicated and well-intentioned.

IHO Decision at 24.

The IHO found that the DOE provided A.S. with a FAPE both procedurally and substantively, satisfying the first prong of the *Burlington/Carter* test. *Id.* With respect to procedural adequacy, the IHO determined that the CSE was properly constituted and that a school psychologist was not required; that the CSE had sufficient evaluative materials to develop the IEP; that the DOE provided A.S. a school placement as he was admitted to a Nest middle school; and that the CSE had no duty to reconvene the IEP after A.S.'s private psychiatric evaluation as the parents never requested a subsequent conference after obtaining the evaluation results. *Id.* at 24–27.

With respect to substantive adequacy, the IHO found that the IEP contained the requisite information about A.S.'s present levels of performance, contained specific goals, and recommended appropriate services. *Id.* at 27–29. Further, the IHO found no evidence that the district's proposed placement for A.S. was inappropriate. *Id.* at 35–36. As it pertained to questions of bullying, the IHO provided a detailed review of the facts concerning incidents of alleged bullying both through email records and testimony from the hearing. *Id.* at 29–34. The IHO stated, "[p]otentially as a result of these incidents, [A.S.] did not want to go to school, and his grades slid and he shut down in class." *Id.* at 35.

31

However, citing *T.K. v. New York City Department of Education*, 32 F. Supp. 3d 405, 422 (E.D.N.Y. 2014))[22] to determine whether bullying resulted in the denial of a FAPE, the IHO stated that while there was "no reason to doubt the credibility and sincerity of Parents' concerns of their son's safety . . . even while crediting the assertions made by the Parents, I find that the preponderance of the evidence fails to establish that school personnel were deliberately indifferent to [A.S.]'s safety or there were active incidents of bullying as opposed to age-appropriate interactions." *Id.* at 35.  The IHO continued, stating that the record, "simply does not support a finding that the incidents [of alleged bullying were] so severe, persistent, or pervasive so that it creates a hostile environment." *Id.* The IHO found that the "e-mails demonstrate that school staff were attentive and responsive to Parents' concerns. *Id.*  The testimony of the teachers and providers demonstrate while the program may not have been perfect for [A.S.], the teachers and providers worked diligently to try to make it work." *Id.*  The IHO also stated that some of the incidents "where [A.S.] was 'caught in the cross-fire' or was injured through a clear accident . . . [are] isolated incidents [that] cannot be fully prevented, especially where free play is an activity that has benefits to elementary school age students." *Id.*

As it pertains to the second and third prongs of the *Burlington/Carter* test, the IHO found that the parents' private placement at the Lang school was appropriate and

---

[22] In an earlier decision in *T.K.*, the district court developed a four-part test to determine if bullying denied a student a FAPE:  "(1) was the student a victim of bullying; (2) did the school have notice of substantial bullying of the student; (3) was the school 'deliberately indifferent' to the bullying, or did it fail to take reasonable steps to prevent the bullying; and (4) did the bullying 'substantially restrict' the student's 'educational opportunities'?"  *T.K. v. New York City Department of Education*, 810 F.3d 869, 874 (2d Cir. 2016) (citing *T.K. v. New York City Department of Education*, 779 F.Supp.2d 289, 316, 318 (E.D.N.Y.2011)).

32

that the equities favored the parents. *Id.* at 36–39. However, because the district had provided A.S. with a FAPE, the parents request for tuition reimbursement was denied. *Id.* at 39.

### 4. SRO's Findings

On appeal, the Plaintiffs challenged the IHO's conduct in scheduling and executing the impartial hearing, the IHO's findings of credibility as to the five DOE witnesses, and the IHO's finding that the district offered A.S. a FAPE for the 2023–24 school year. *See* SRO Decision at 5. The DOE challenged the IHO's finding that the equitable considerations favored the Plaintiffs. *Id.*

SRO Justyn Bates issued a twenty-four-page decision on September 16, 2024. *Id.* at 1–24. After examining the adjournment determinations and discovery decisions, the SRO determined that the IHO acted fairly and impartially and did not abuse his discretion. *Id.* at 8–11. The SRO next affirmed the IHO's credibility determinations. *Id.* at 11–12.

With respect to the procedural violations, the SRO found that Plaintiffs argument that the CSE was not properly constituted because a school psychologist did not participate was not properly raised in their due process complaint and therefore was waived; that the 2023 IEP was not predetermined; that the CSE had sufficient evaluative information to develop the IEP; and that the district did not fail to reconvene the IEP. *Id.* at 11–18.

Applying the four-part test from *T.K.*, the SRO affirmed the IHO's findings that the district was not "deliberately indifferent" to the accusations of bullying nor was there

33

evidence that "the incidents substantially restricted [A.S.]'s educational opportunities."[23]
*Id.* at 20 (citing *T.K.*, 779 F.Supp.2d 289 (E.D.N.Y. 2011)).  Further, the SRO affirmed
the IHOs findings that that the DOE provided Plaintiffs with a valid placement notice as
A.S. was admitted to a Nest middle school and that there was no evidence on the record
that the proposed placement could not implement A.S.'s IEP.  *Id.* at 21–24.  Accordingly,
the SRO affirmed the IHO's finding that the DOE provided A.S. with a FAPE and denied
tuition reimbursement on that ground without evaluating whether equitable considera-
tions favored the plaintiffs.  *Id.* at 24.

    5.  *This Action*

Plaintiffs filed the complaint in this action on December 16, 2024, seeking
reversal of the SRO's decision.  Doc. 1.  On May 22, 2025, the Court received the
administrative record, which was filed under seal.  Doc. 13.  The parties cross-moved for
summary judgment, Docs. 14 and 15, and on September 2, 2025, the motions were fully
briefed.  *See* Doc. 18.

## III.  STANDARD OF REVIEW

"Though the parties in an IDEA action may call the procedure 'a motion for
summary judgment,' the procedure is in substance an appeal from an administrative
determination, not a summary judgment [motion]."  *M.H. v. New York City Department of
Education*, 685 F.3d 217, 226 (2d Cir. 2012) (alterations in original) (internal citations
omitted).  The existence of a genuine issue of material fact will not result in a denial.  *J.R.*

---

[23] The SRO concluded, "after an independent review of the hearing record, it does not appear that any of the incidents alleged by the [P]arents would pass the test established in *TK* as indicated above.  Simply, there is no evidence that the [DOE] was 'deliberately indifferent' to the allegations of bullying or failed to take reasonable steps to prevent bullying; nor is there evidence that the incidents substantially restricted the student's educational opportunities."  SRO Decision at 20.

*ex rel. S.R. v. Board of Education*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004).  Instead, a federal court reviewing an administrative decision under the IDEA bases its decision on an independent review of the record using a "preponderance of the evidence" standard. *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 205 (1982).[24]

However, "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.'  Although the district court must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' . . . such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review' . . ." *Gagliardo*, 489 F.3d at 112–13 (internal citations omitted). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Sherman v. Mamaroneck Union Free School District*, 340 F.3d 87, 93 (2d Cir. 2003) (internal quotation marks omitted) (citing *Walczak*, 142 F.3d at 129). "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *C.F.*, 746 F.3d at 72 (quoting *M.H.*, 685 F.3d at 244).

As the Second Circuit has articulated, the level of deference owed by district courts to the administrative findings below must "hinge on the kinds of considerations

---

[24] In addition to the administrative record, upon either party's request, the Court must also review any supplemental evidence.  20 U.S.C. § 1415(i)(2)(C)(i)–(ii).

35

that normally determine whether any particular judgment is persuasive." *M.H.,* 685 F.3d at 244. Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.,* 746 F.3d at 77. The court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role," *M.H.,* 685 F.3d at 244. Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures. . . . Determinations grounded in thorough and logical reasoning should be provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.,* 685 F.3d at 244 (internal citations omitted)*; see also Gagliardo*, 489 F.3d at 113 (explaining that "deference to the administrative proceedings is particularly warranted when the district court's decision is based solely on the administrative record.").

"[W]here the SRO and IHO agree, '[d]eference to the conclusions of the administrators on this issue is particularly appropriate.'" *C.W. v. City School District of the City of New York,* 171 F. Supp. 3d 126, 131 (S.D.N.Y. 2016) (internal citations omitted); *see also F. v. City School District of the City of New York*, No. 15 CIV. 1448 (ER), 2016 WL 1274579, at *10 (S.D.N.Y. Mar. 31, 2016) ("[A]lthough the district court is not prohibited from reversing IHO and SRO decisions that are in agreement, the law in this Circuit counsels strongly against doing so."). However, where the IHO and SRO disagree, the general rule is that "courts must defer to the reasoned conclusions of the SRO as the final

36

state administrative determination . . . unless [the district court] concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189 (citing *M.H.,* 685 F.3d at 246).

"On 'issues of law,' however, 'such as the proper interpretation of the federal statute and its requirements,' courts owe no deference to state hearing officers." *Board of Education of Yorktown Central School District v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (citing *Lillbask*, 397 F.3d at 82).

## IV.    DISCUSSION

Plaintiffs argue that the SRO decision largely affirming the IHO's findings should be reversed because the record demonstrates that the DOE substantively and procedurally denied A.S. a FAPE; the impartial hearing was improperly conducted; and the IHO's credibility determinations of DOE witnesses were incorrect. Doc. 14 at 9–25. The DOE asserts that the SRO decision was well-reasoned and supported by the record and therefore should be affirmed. Doc. 15 at 10–25. The Court examines each of Plaintiff's objections to the SRO's decision in turn.

### A.  Substantive Denials of a FAPE under the IDEA

#### 1. Bullying

Plaintiffs argue that a preponderance of evidence demonstrates that the DOE denied A.S. a FAPE because it failed to take reasonable steps to address bullying that was restricting A.S.'s education. Docs. 14 at 9–14. Meanwhile, the DOE argues that the SRO's and IHO's review of the record was well-reasoned, deserves deference, and that there is no evidence that the DOE was "deliberately indifferent" to the allegations of bullying. Docs. 15 at 13–17.

The Second Circuit has "not decided when the failure to address bullying in a student's IEP results in a substantive denial of a FAPE." *C.S. v. Yorktown Century School District*, No. 16-CV-09950, 2018 WL 1627262, at *28 (S.D.N.Y. Mar. 30, 2018); *see T.K. v. New York City Department of Education*, 810 F.3d 869, 876 (2d Cir. 2016) ("We have not previously addressed whether the bullying of a student with a disability is an appropriate consideration in the development of an IEP and can result in the denial of a FAPE under the IDEA.  Because [in the instant case,] the Department concedes that it can be an appropriate consideration . . . we assume as much without deciding the issue.");[25] *but see T.K.,* 32 F. Supp. 3d 405, 411 (E.D.N.Y. 2014), *aff'd on other grounds,* 810 F.3d 869 (2d Cir. 2016) ("[W]here there is a legitimate concern that bullying will severely restrict a disabled student's educational opportunities, . . .  the IEP team is required to consider evidence of bullying in developing an appropriate [IEP] . . .  where there is a substantial probability that bullying will severely restrict a disabled student's educational opportunities, . . .  an anti-bullying program is required to be included in the IEP.").

The SRO applied the four-factor test set forth by the District Court in *T.K.* to determine whether bullying resulted in the denial of a FAPE:  "(1) was the student a victim of bullying; (2) did the school have notice of substantial bullying of the student; (3) was the school 'deliberately indifferent' to the bullying, or did it fail to take

---

[25] Because the Second Circuit did not reach the issue of whether bullying is an appropriate consideration in the development of an IEP, it did not substantively discuss the District Court's four-part test. *T.K.*, 810 F.3d 869 at n.3 ("Because we hold that the Department denied [the student] a FAPE as a result of its procedural violations, we also need not and do not reach the question whether the bullying at issue here was so severe that the failure to address it in [the student's] IEP resulted in a substantive denial of a FAPE.  For the same reason, we express no opinion as to whether the District Court's four-part test for determining when bullying results in the substantive denial of a FAPE correctly states the law.").

reasonable steps to prevent the bullying; and (4) did the bullying 'substantially restrict' the student's 'educational opportunities'?" *T.K.*, 810 F.3d at 874 (2d Cir. 2016) (citing *T.K.*, 779 F.Supp.2d at 316, 318 (E.D.N.Y. 2011)).[26] The parties do not dispute the use of this test. Further, multiple courts in this district have cited to four-factor test favorably. *See, e.g., T.J. V. Board of Education of Mount Vernon City School District*, No. 17-CV-09592, 2019 WL 13170168, at *15 (S.D.N.Y. Sept. 30, 2019); *B.D. v. Eldred Central School District*, 661 F. Supp. 3d 299, 313–14 (S.D.N.Y. 2023).

Both the IHO and SRO found that the DOE did not deny A.S. a FAPE because Plaintiffs failed to satisfy the third *T.K.* factor—that the school was deliberately indifferent to the alleged bullying or failed to take reasonable steps to prevent the bullying. *See* SRO Decision at 20 ("[A]fter an independent review of the hearing record . . . there is no evidence that the district was 'deliberately indifferent' to the allegations of bullying or failed to take reasonable steps to prevent bullying."). The SRO decision also determined that Plaintiffs failed to satisfy the fourth *T.K.* factor. *Id.* at 20 ("[N]or is there evidence that the incidents substantially restricted the student's educational opportunities.")[27]

With respect to the third *T.K.* factor, the Court agrees with the IHO and SRO that the evidence in the record does not support finding that under a preponderance of the

---

[26] The IHO Decision also cited to the District Court opinion in *T.K.*, though it did not explicitly apply the four-factor test. *See* IHO Decision at 23.

[27] The IHO decision also found that the record failed to show the first *T.K.* factor was met, as the record "fails to establish that . . . there were active incidents of bullying as opposed to age-appropriate interactions." IHO Decision at 35. The SRO decision does not address this factor directly, though the SRO did assert that "there is no evidence in the hearing record that would warrant disturbing the IHO's well-reasoned determination on the issue." SRO Decision at 20.

evidence standard, the school district acted with deliberate indifference or failed to take reasonable steps to prevent bullying during the 2023–24 school year.

On the one hand at the impartial hearing, A.S.'s mother expressed concerns that the school was inadequately investigating the alleged incidents of bullying and would rarely follow up with parents about any investigation. Tr. at 473–75 ("I could maybe count on one hand the times when the school followed up. But there were just many sort of out of the blue, come get your kid, you know, he is hurt."). She continued that, when such investigations occurred, the "vast majority" of the time there was no additional follow up. *Id.* at 474–75. Further, A.S.'s mother stated that, rather than formal communication between the school and the Plaintiffs, sometimes A.S. would "come home with a note from the nurse, in his backpack . . . [o]r sometimes, we'd get a call from the nurse and get some of the story." *Id.* 473–75.[28]

However, for the specific incidents of alleged bullying that were identified in the record or discussed in the parties' papers, it appears that the school acted to investigate the issues and prevent future incidents. *See* P. Ex. M (email from the school providing A.S.'s father with the science teacher's contact information, after A.S.'s father raised a potential issue of bullying in science class); Tr. at 472 (the mother's testimony indicating that the school reseated A.S. in science class away from the alleged bully); P. Ex. K (email between A.S.'s mother and the school, indicating that after A.S. was punched by

---

[28] The IHO found the mother's testimony concerning these incidents credible, and from the Court's review of the record, there is no reason to disturb that finding. *See* IHO Decision at 35 ("I have no reason to doubt the credibility and sincerity of [the p]arents' concerns regarding their son's safety issues.").

Plaintiff argues that "crediting the mother's testimony and evidence requires reaching a conclusion that despite ample notice, the DOE denied [a] FAPE by ignoring A.S.'s daily struggles . . ." Doc. 14 at 13. The Court disagrees. Crediting the sincerity of the concerns of the mother does not alone demonstrate that the District denied A.S. a FAPE, as explained in this section. *See* IHO Decision at 35.

another child, one staff member spoke with A.S. and one with the other student, and an investigation would follow); Tr. at 472 (the mother's testimony indicating that teachers moved A.S.'s seat in a class where one student was repeatedly tripping A.S. and stated he was going to "make [A.S.]'s day miserable"); P. Ex. O (email between the mother and the school indicating that after an incident where A.S.'s glasses were taken and water was poured on his head, the school investigated, spoke with all the children involved, and the other children all apologized to A.S.).[29] The caselaw Plaintiffs cite to the contrary is factually distinct and ultimately does not support finding that the school was deliberately indifferent. *See, e.g., T.K. v. New York City Department of Education*, 32 F. Supp. 3d 405, 420 (E.D.N.Y. 2014), *aff'd*, 810 F.3d 869 (2d Cir. 2016) (finding deliberate indifference where parents and special education teachers' numerous attempts to discuss bullying with school personnel were ignored; where the parents attempt to raise issues of bullying to the principal was rebuffed; where parents' written requests to see incident reports were consistently denied; and where teachers' responses to bullying "may have further alienated [the child] and given other students . . . the impression that their behavior was appropriate."); [30] *B.D. v. Eldred Central School District*, 661 F. Supp. 3d at 315 (finding a school was not deliberately indifferent to bullying, where it developed a safety plan which included both reactive and preventative measures to prevent bullying).

---

[29] The record mentions an incident in which A.S. was sent to the emergency room because another student "stomped on his hand." P. Ex. C., P. Ex. K. However, in their papers, the parties do not cite records of this incident directly or of the school's response, or lack thereof.

[30] In Plaintiffs' briefs, they cite to the Second Circuit decision in *TK*, rather than the district court opinion. *See* Docs. 14 at 9–10; 17 at 6–8. However, at the Second Circuit, the court did not directly address whether the school acted with deliberate indifference. *T.K*, 810 F.3d at 876.

In arguing that the school acted with deliberate indifference, Plaintiffs focus on the fact that the February 8, 2023 CSE failed to discuss any alleged bullying or physical injuries; that the resultant IEP states that the Plaintiffs "have not expressed any concern in regard to [A.S's] social development"; and that DOE witnesses at the impartial hearing further evinced deliberate indifference by questioning whether the incidents described amounted to bullying, and at times failing to recall the specific incidents at issue. *See* Doc. 14 at 11–13. However, these arguments are unavailing. First, it is true that both Angelinas and Stamos stated that they could not recall if bullying was discussed at the IEP meeting and that the IEP states that the parents had "not expressed any concern in regard to [A.S.'s] social development." *See* Tr. at 50, 170; D. Ex. 4 at 5. However, the Second Circuit has not found that a failure to discuss bullying at the CSE or in the IEP alone is sufficient to constitute a substantive denial of a FAPE. *See B.D.*, 661 F. Supp. 3d at 319 ("Neither IDEA nor New York State law require . . . that schools only address bullying through the formal IEP process."); *T.K.*, 810 F.3d 869 at n.3 ("[W]e also . . . do not reach the question whether the bullying at issue here was so severe that the failure to address it in [student's] IEP resulted in a substantive denial of a FAPE").[31] Further, while

---

[31] Even though at least one district court has found that in certain circumstances a failure to discuss bullying at a CSE or in an IEP results in the denial of a FAPE, the facts of that case are materially distinct from of the instant case. *See T.K.*, 32 F. Supp. 3d, at 418.

In that case, the court found that where there is a "legitimate concern that bullying will severely restrict a disabled student's educational opportunities, as a matter of law the IEP team is required to consider evidence of bullying," and that "where there is a substantial probability that bullying will severely restrict a disabled student's educational opportunities, as a matter of law, an anti-bullying program is required to be included in the IEP." *Id.* at 411. In finding that bullying should have been addressed at the students' CSE and in the student's IEP for the 2008–09 school year, the court looked to the fact that for the 2007–08 year, the school denied the student a FAPE due to failing to adequately respond to severe bullying. *Id.* at 418. The court also looked to the well documented effects that bullying had on the student's educational opportunities. *Id.* at 418–19.

Chryssos-Lignos argued that the incidents described were better described as "conflicts" as opposed to "bullying," and DOE witnesses could not recall the incidents described, that similarly does not change the fact that, for the incidents at issue, the school responded reasonably as described above.[32] *See* Tr. at 284–85.

With respect to the fourth *T.K.* factor, this is a closer call, but the Court ultimately defers to the SRO's decision as one of educational policy. *See* SRO Decision at 20 ("[N]or is there evidence that the incidents substantially restricted the student's educational opportunities."). On the one hand, A.S.'s mother credibly testified that his attitude towards school deteriorated throughout the school year and that his injuries were affecting his emotions, his self-confidence, and his grades. Tr. at 469–70, 498–99. Prior to the CSE, she emailed school staff saying that A.S. is on a "very steep academic decline . . . He's losing an entire grade point average per year." P. Ex. C. Further, the IEP evaluation results show that some of A.S.'s academic scores declined between the 2022 and 2023 IEPs. *E.g. compare* P. Ex. Q at 2 (2022 IEP stating that A.S. was at grade level for reading) *with* D. Ex. 4 at 2 (2023 IEP stating that A.S. was approaching grade level for reading); D. Ex. 4 at 1 (2023 IEP stating that, according to the Acadience Benchmark evaluation, A.S.'s "words correct decreased indicating he read less words and the retell quality also decreased.").

---

In the instant case, there is no allegation that the school denied A.S. a FAPE for the prior school year, due to failing to respond to bullying. Further, while Plaintiffs proffer evidence of many instances of alleged bullying or injuries to A.S., only a couple of those instances occurred prior to the development of A.S.'s 2023 IEP. *See* P. Ex. K, M. Further, as discussed below, comparatively, Plaintiffs in this case do not introduce as extensive evidence the negative impact of bullying on A.S.'s educational opportunities. Accordingly, Plaintiffs have failed to demonstrate that the 2023 IEP is deficient for failing to mention bullying.

[32] Further, as detailed below, the Court sees no reason to reverse the credibility determinations made by the IHO and affirmed by the SRO with respect to the DOE witnesses.

On the other hand, the record as to whether the alleged bullying substantially restricted A.S.'s educational opportunities is less robust than in the cases that Plaintiffs cite. *See T.K.*, 32 F.Supp.3d at 419 (indicating that the student complained to her parents daily about being bullied; that parents testified that the student "withdrew emotionally . . . and was more subdued during the . . . school year"; that a developmental pediatrician stated the student "was not as happy and interactive as she had been before" and "seemed to have shut down"; that three special education itinerant teachers ("SEITs") testified that the student was "the subject of ridicule from other students and ostracized in the class"; that the three SEITs testified that the classroom was a "hostile environment" where other students treated her "like a 'pariah' and laughed at her for trying to participate in class" and frequently avoided the student; and that the student was "late or absent 46 times . . . [mainly] because she did not want to go to school due to a fear of being ostracized.").[33] Because the evidence in the record is less severe, and as the decision as to whether educational opportunities were substantially restricted is one of education policy, the Court defers to the SRO's finding that the fourth *T.K.* factor is not satisfied.

Finally, Plaintiffs argue that "even if one were to entire[ly] set aside the copious details and proof of bullying . . . DOE's utter failure to acknowledge or even address A.S.'s mental health—whatever the cause—itself constitutes a sufficient denial of [a] FAPE." Doc. 14 at 13–14. In support of this argument, Plaintiffs cite two Second Circuit cases. *Muller on Behalf of Muller v. Committee on Special Education of East Islip Union*

---

[33] Plaintiffs also cite to *B.D.* for this point, however the District Court in *B.D.* focused on the third factor of the *T.K.* test—whether the school were deliberately indifferent to parents' claims of bullying. *B.D.*, 661 F. Supp. 3d at 314.

44

*Free School District*, 145 F.3d 95, 102 (2d Cir. 1998), and *Hardison v. Board of Education of the Oneonta City School District*, 773 F.3d 372 (2d Cir. 2014).

However, neither case is on point. *Muller* examined whether a student with a long history of mental health issues should have been classified as a "child with disabilities" and therefore provided with an IEP and the other safeguards established by the IDEA and state regulations. *See Muller*, 145 F.3d at 102 ("[T]he issue before the district court was whether the school district properly classified [student] as an individual with or without a disability in the first instance."). The operative question was whether in looking to the student's mental health history, the CSEs improperly concluded that the student did not have a "serious emotional disturbance" to constitute a disability under the IDEA. *Muller*, 145 F.3d at 104–05. The Second Circuit ultimately found that the student did have a "serious emotional disturbance" and therefore was entitled to a FAPE. *Id.* While *Muller* requires that a school develop an IEP for a student where they have a "serious emotional disturbance," Plaintiffs make no argument that A.S.'s mental health concerns reach that level. *Id.* at 103. Further, unlike in *Muller*, it is undisputed that A.S. was classified as a student with disabilities and owed the protections of the IDEA. *Id.*

While *Hardison* also involved a student with a history of mental health issues, the Second Circuit decided the case entirely on the second prong of the *Burlington/Carter* test, finding the parents private placement was inappropriate. *Hardison*, 773 F.3d at 388 ("Because we defer to the SRO's finding that the record lacked sufficient detail to establish that [the other school] was an appropriate placement for [the child], and that finding requires a denial of reimbursement to [plaintiffs], we do not reach the additional

45

issues raised by the parties on appeal."). [34] Accordingly, the Second Circuit never reached the question of whether the DOE's failure to evaluate mental health concerns of the student resulted in the denial of FAPE.

Accordingly, the Court affirms the SRO's conclusion that the alleged bullying does not support a finding that the district denied A.S. a FAPE.

### 2. *Substantive Validity of the IEP*

Plaintiffs argue that the DOE failed "to carry its burden . . . because it offered zero evidence or testimony related to the school year at issue . . . [n]or has the DOE to date ever issued the Parents a placement notice nor even identified a public placement that can implement the IEP as written . . . ." Docs. 14 at 14–17; 17 at 9–12. The DOE argues that the school district did not have to name a specific school location in the IEP, that A.S. had been admitted to a Nest middle school for the year in question, and that Plaintiff's contentions that no public school could satisfy A.S.'s IEP is speculative. Docs. 15 at 17–20; 18 at 7.

The first prong in the *Burlington/Carter* test requires that "the DOE [] establish that the IEP was appropriate, i.e., that it would actually provide a FAPE." *Q.W.H. v. New York City Department of Education*, No. 15-CV-1876 (VEC), 2016 WL 916422, at *6 (S.D.N.Y. Mar. 7, 2016) (citation omitted). "Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of

---

[34] The IHO in *Hardison* did initially find that for the 2008–09 school year, "the District failed to provide [the student] a FAPE because the school psychologist failed to evaluate thoroughly [the student's] mental health issues; the CSE failed to develop information relative to [the student]'s educational history; and, despite receiving information from the [Parents] that [the student] was 'collapsing into depression' the District did not reconvene the CSE." *Hardison v. Board of Education of the Oneonta City School District*, 773 F.3d 372, 384 (2d Cir. 2014). The SRO reversed that finding in part. *Id.* As discussed above, the Second Circuit never considered the issue.

its plan at a due process hearing." *M.O.*, 793 F.3d at 243.  In examining the validity of

the IEP, courts look to both the procedural and substantive validity of the IEP.  *See C.F.*,

746 F.3d at 81.  In examining substantive adequacy, courts examine whether the IEP "was

reasonably calculated to enable the child to receive educational benefits."  *R.E.,* 694 F.3d

at 190 (internal citations omitted). "[S]ubstantive adequacy of the IEP must be

determined by reference to the written IEP itself."  *M.O.*, 793 F.3d at 245.  "Substantive

inadequacy automatically entitles the parents to reimbursement."  *C.F.*, 746 F.3d at 79.

Plaintiffs first argue that "DOE has offered no showing on the IEP for the [2023–

24] school year at issue, instead focusing on the program for A.S.'s prior school year . . ."

Doc. 14 at 14.  To the extent that this is a substantive challenge to the language of the

IEP, Plaintiffs do not specifically identify a section of the IEP they believe is inadequate,

and Court therefore finds no reason to overturn the determinations below.  *See* IHO

Decision at 27–29.[35]

Plaintiffs next argue that the DOE has not "ever issued the [Plaintiffs] a placement

notice" about the 2023–24 school year.[36]  As the SRO noted, there is no requirement in

the IDEA that an IEP name a specific school location.  *See T.Y. v. New York City*

*Department of Education,* 584 F.3d 412, 420 (2d Cir. 2009) ("Because there is no

requirement in the IDEA that the IEP name a specific school location, T.Y.'s IEP was not

procedurally deficient for that reason").  However, a district must notify parents of the

location that their child can receive the special education program set forth in the IEP

---

[35] The SRO did not explicitly evaluate the validity of the IEP's written provisions on appeal.  *See* SRO Decision at 5 (outlining the issues raised on appeal).

[36] Though this is a procedural argument, due to the fact that Plaintiffs include it in their substantive challenges to the denial of a FAPE, and because it is factually related to the argument about the adequacy of the school placement, the Court considers the issue here.

prior to the start of the IEP. *See R.B. v. New York City Department of Education,* No.

15CV6331 (DLC), 2016 WL 2939167, at *9 (S.D.N.Y. May 19, 2016), *aff'd*, 689 F.

App'x 48 (2d Cir. 2017) ("Under the IDEA, a district must provide written notice to the

parents of a child, a reasonable time before (1) initiating or changing the identification,

evaluation, or education placement of the child or the provision of a FAPE to the child, or

(2) refusing to initiate or change the identification, evaluation, or educational placement

of the child or the provision of a FAPE to the child."); *see also T.C. v. New York City*

*Department of Education*, No. 15-CV-3477 (VEC), 2016 WL 1261137, at *9 (S.D.N.Y.

Mar. 30, 2016) ("[I]n order to provide a FAPE, a parent must necessarily receive some

form of notice of the school placement by the start of the school year.").[37]

Here, the Court finds that the failure of the DOE to issue a formal placement

notice does not amount to the denial of a FAPE. While the IEP did not identify a

placement school, both the IHO and SRO found that A.S. had been admitted to a Nest

middle school, and therefore a "'brick and mortar' location for the February 2023 IEP to

be implemented was identified prior to the start of the 2023–24 school year." SRO

Decision at 22; *see* IHO Decision at 26–27. According to the mother's testimony at the

impartial hearing, Nest students are eligible to matriculate to four or five different middle

schools, and accordingly she visited each of those locations. Tr. at 488–490. Further,

A.S.'s mother testified that she received a letter of admission from a Nest middle school

in the spring of 2023 and knew that A.S. had a spot at that middle school for the 2023–24

---

[37] Plaintiffs argue that the placement notice was due on June 15 rather than the start of the school year. *See* Doc. 14 at 15. In doing so, they rely on *E.H. v. New York City Department of Education*. 164 F. Supp. 3d 539, 548 (S.D.N.Y. 2016). The plaintiffs in *E.H.* argued that an existing "consent decree requires [that] children in a twelve[-]month school year must be provided with a placement notice on or before June 15." *Id.* In the instant case, the DOE does not respond directly. Regardless, as detailed below, A.S.'s mother received admission into a Nest middle school in the Spring of 2023.

school year. *Id*. at 490. The SRO concluded that this satisfied the district's burden to notify the parents. *See* SRO Decision at 22.

However, even if there was a procedural violation, Plaintiffs fail to articulate how the lack of a more formal or earlier placement deprived them of an opportunity to participate in the decision-making process or impacted A.S.'s education. *See Ambrister v. Banks*, No. 24-2852-CV, 2025 WL 2775936, at *4 (2d Cir. 2025) (affirming a district court which found that the lack of a timely placement notice did not suffice to a denial of a FAPE, in part because parents "fail[ed] to demonstrate, or even argue that [they] would have acted differently had [they] been notified of the school placement one month earlier.") (internal quotations omitted).

Finally, Plaintiffs argue that the DOE failed to "prove [the] designated school's ability to satisfy the IEP's requirements" as the DOE witnesses did not testify as to "services A.S. would have actually received for the [2023–24] school year." Doc. 14 at 14–15. Plaintiffs argue that the Nest middle school to which A.S. was admitted was ill equipped to support him and could not implement the IEP, as the IEP calls for twelve months of services and Nest schools are only open for ten months a year. Doc. 14 at 16.[38]

While parents can challenge a district's ability to implement an IEP, "[w]here the IEP is not facially inadequate, . . . the plaintiff 'bear[s] the burden of proof on prospective challenges to the adequacy of a proposed placement.'" *Z.C. v. New York City Department*

---

[38] Plaintiffs also argue that the DOE's testimony concerning the support A.S. received in a Nest elementary school is inapplicable, because the "IEP recommends that A.S. be placed in another ICT class in a different district" and when asked at the impartial hearing, Angelinas did not know if schools in that district offered the Nest program. Doc. 14 at 16. As a preliminary matter, the 2023 IEP's school placement recommendation was identical to the 2022 IEP's recommendation: "NYC DOE School Non-Specialized (District 1-32)." *Compare* D. Ex. 4 at 25 with P. Ex. Q at 22. However, as detailed below, Plaintiffs have put forth insufficient evidence in the record to support finding that the Nest middle school to which A.S. was admitted would have been incapable of implementing the 2023 IEP.

*of Education*, 222 F. Supp. 3d 326, 338 (S.D.N.Y. 2016) (internal citations omitted); *see*

*J.C. v. New York City Department of Education* 643 F. App'x 31, 33 (2d Cir. 2016)

("[O]ur Court held that, under *R.E.,* parents could bring challenges based on the assigned

school's actual, and non-speculative, inability to comply with the IEP without first

enrolling their child in the deficient school.") (citing *M.O.*, 793 F.3d 236).[39]  In bringing a

non-speculative placement challenge, parents must demonstrate that the placement school

is incapable of implementing the IEP as written.  *See M.O.*, 793 F.3d at 244 ("While it is

speculative to conclude that a school with the capacity to implement a given student's

IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an

IEP cannot be implemented at a proposed school that lacks the services required by the

---

[39] Plaintiffs cite *W.W. v. New York City Department of Education*, to support the proposition that the school district, not the parents, are the ones who bear the burden to prove the placement school could implement A.S.'s IEP. Doc. 14 at 14–15; 160 F. Supp. 3d 618. In *W.W.*, the court found that a "necessary inference" of the Second Circuit case *M.O.*, 793 F.3d 236, was that "the school district bears the burden of showing that the proposed placement school has the capacity to implement the child's IEP." 160 F. Supp. 3d 618, 627 (S.D.N.Y. 2016). In *W.W.*, though the parents had presented evidence that the placement school was incapable of implementing the IEP, the court found that parents' "nonspeculative evidence" is "not required to raise a prospective challenge [as to placement] in a due process complaint." *Id.*

However, a majority of courts have found that it is the Plaintiffs' burden to introduce evidence that the placement school is factually incapable of implementing the IEP. *N.B. v. New York City Department of Education*, 711 F. App'x 29, 33 (2d Cir. 2017) ("Because [the student] never attended [the placement school], this is a prospective challenge and requires the Parents to demonstrate the school's inability to provide the services as mandated by the IEP"); *Cornett v. Banks*, No. 23-CV-06893 (MMG), 2025 WL 712799, at *8 (S.D.N.Y. Mar. 5, 2025), *aff'd sub nom. Cornett v. Samuels*, No. 25-830, 2026 WL 456257 (2d Cir. Feb. 18, 2026) ("To succeed on a challenge to a prospective school placement, parents must 'demonstrate the school's inability to provide the services as mandated by the IEP.'") (internal citations omitted); *L.C. v. New York City Department of Education*, No. 15 CIV. 4092 (PAC), 2016 WL 4690411, at *5 (S.D.N.Y. Sept. 6, 2016) ("But no school administrator told her that [the placement school] was unable to implement [the student's] IEP . . . . Speculation along those lines is insufficient to raise a prospective challenge to a proposed school placement. Accordingly, DOE was not required to adduce any evidence regarding the appropriateness of its recommended school placement . . .") (internal citations omitted); *see also J.M. v. New York City Department of Education,* 171 F. Supp. 3d 236, 249 (S.D.N.Y. 2016); *Z.C. v. New York City Department of Education*, 222 F. Supp. 3d 326, 338 (S.D.N.Y. 2016*); Q.W.H. v. New York City Department of Education,* No. 15-CV-1876 (VEC), 2016 WL 916422, at *12 (S.D.N.Y. Mar. 7, 2016).

Accordingly, this Court finds that Plaintiffs bear the burden to introduce evidence that the placement school is factually incapable of implementing the IEP. As detailed above, the Plaintiffs have not provided sufficient evidence.

50

IEP") (internal citations omitted). "To succeed, plaintiffs must prove that the school is 'factually incapable of implementing the IEP.'" *Cornett v. Banks*, No. 23-CV-06893 (MMG), 2025 WL 712799, at *4 (S.D.N.Y. Mar. 5, 2025), *aff'd sub nom. Cornett v. Samuels*, No. 25-830, 2026 WL 456257 (2d Cir. Feb. 18, 2026) (internal citation omitted).

Here, because Plaintiffs are challenging A.S.'s school placement, they bear the burden of proving that the school is factually incapable of implementing the IEP. Plaintiffs fail to meet that burden.

In their papers, Plaintiffs do not cite to anything in the administrative record demonstrating that the placement school could not implement the IEP as written. They first cite to A.S.'s mother's testimony about the Nest middle schools she visited, which she determined were inappropriate due to the number of students, the fact that some of the schools were joint middle and high schools, and her worry that A.S. "wasn't [] going to be able to navigate [] that space." Tr. 518–20. However, these beliefs are not arguments that the placement school could not implement the IEP. *See M.O.*, 793 F.3d at 245 ("[A]lthough [Plaintiff] testified that she visited [the placement school] and found that the placement was inappropriate, her assertion was based on her own belief that 'if [the student] was put in there, he would shut down completely' rather than on [the placement school's] lack of IEP-mandated services. This challenge . . . did not trigger a duty on the part of the school district to provide evidence regarding [the placement school]'s adequacy.").

Plaintiffs further argue that the Nest middle school was incapable of implementing A.S.'s IEP because the IEP recommends twelve months of services and "Nest schools . . .

51

were only open ten months of the year." Doc. 17 at 10; *see* D. Ex. 4 at 20. First, the September 2011 "ASD Nest Program Family Handbook" that Plaintiffs cite states that while the "ASD Nest Program is a ten-month program . . . the DOE has arranged for special education services for the summer on a case-by-case, year-by-year basis." N.Y.C. DEPARTMENT OF EDUCATION, *ASD Nest Program Family Handbook*, Sept. 2011, 4 https://docs.steinhardt.nyu.edu/pdfs/metrocenter/al170/ASDNestFamilyHandbook.pdf (last visited March 20, 2026). Assuming the information in this report is still accurate, this is insufficient to show that the Nest middle school would be incapable of implementing summer services, as by the handbook's own language, summer services are available on a case-by-case basis. *Id.*; s*ee also M.L. v. New York City Department of Education*, No. 13-CV-2314 (RRM) (LB), 2015 WL 1439698, at *11 (E.D.N.Y. Mar. 27, 2015) ("[T]he DOE need only be prepared to implement the IEP by the first day of school") (citing *S.M. v. Taconic Hills Central School District,* 553 Fed. App'x. 65, 66 (2d Cir.2014)). Further, Plaintiffs point to no other evidence in the record to indicate the placement school could not implement the twelve-month requirement or any other portion of the IEP. The Court finds that Plaintiff has not sufficiently demonstrated that the placement school was factually incapable of administering the IEP.

## B. Procedural Denials of a FAPE under the IDEA

Plaintiffs argue that the Court should additionally reverse the SRO's decision because the DOE engaged in "numerous procedural denials of [a] FAPE" both in the development of the IEP and the conduct of the impartial hearing. Doc. 14 at 17–25.

### 1. Development of the IEP

Plaintiffs argue the DOE violated New York law in four respects when developing the IEP: (1) failing to have a school psychologist present during IEP meetings, despite the fact that a more restrictive program was considered; (2) failing to look at empirical data including a triennial evaluation; (3) failing to respond to Parents' request to reconvene an IEP meeting in April 2023; and (4) by engaging in improper predetermination resulting in a 2023 IEP which is "nearly identical" to the one for 2022. Docs. 14 at 17–19; 17 at 12–13. The DOE argues that the SRO's findings should be affirmed because (1) the Plaintiffs waived any argument about the presence of a school psychologist at the CSE; (2) the DOE did consider empirical data in developing the IEP; (3) the DOE was not at fault for the failure to reconvene the CSE in April 2023; and (4) the 2023 IEP was not predetermined. Docs. 15 at 20–22; 18 at 8–9.

Determining whether an IEP procedural complies with the IDEA is "no mere formality," since "adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Walczak*, 142 F.3d at 129. At the same time, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *A.C. ex rel. M.C. v. Board of Education of The Chappaqua Central School District*, 553 F.3d 165, 172 (2d Cir. 2009). A procedural violation renders an IEP legally inadequate only when the violation (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits." *Cornett*, 2025 WL 712799 at *6 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). "[P]rocedural inadequacies that

individually or cumulatively result in the loss [of] educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of a FAPE." *Werner*, 363 F. Supp. 2d at 659.

### a. Presence of a School Psychologist at the IEP

First, Plaintiffs argue that "although the law clearly requires a school psychologist to be present [in] any IEP meeting where a more restrictive program is considered, it is undisputed . . . both that such a program was considered and that no school psychologist was present." Doc. 14 at 17 (internal citations omitted). Therefore, they argue, A.S. was deprived a FAPE. The SRO denied this argument because the issue was "not raised in the due process complaint nor did the parents make a request during the impartial hearing to amend their due process complaint to make such a claim." SRO Decision at 12.[40]

"The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the [due process complaint], unless the other party agrees otherwise." 20 U.S.C. § 1415(f)(3)(B). "This is not a mere technicality, but a procedural protection of fair notice . . . " *Ambrister v. Banks*, No. 23-CV-2746 (JGLC) (BCM), 2024 WL 4326933, at *5 (S.D.N.Y. Sept. 27, 2024), *aff'd,* 2025 WL 2775936 (2d Cir. Sept. 30, 2025). "District courts in this circuit have held that issues not raised in due process complaints are foreclosed from review in federal court, absent

---

[40] Plaintiffs also argue that the SRO impermissibly reached this conclusion *sua sponte*, *see* Doc. 14 at 17–18; however, as discussed, though the "waiver rule is not to be mechanically applied," "issues not raised in due process complaints are foreclosed from review in federal courts." *C.F.*, 746 F.3d at 78 (collecting cases).

The IHO decided the issue on alternate grounds, stating that "there was no evidence of a substantive recommendation or discussion on moving [A.S.] to a more restrictive placement. . . . Where, as here, there is no evidence that the committee actively considered a move to a more restrictive classroom, I find that the statute does not require the presence of a school psychologist." IHO Decision at 25.

agreement from the opposing party." *C.F.*, 746 F.3d at 78 (collecting cases). However, "the waiver rule is not to be mechanically applied." *Id*. Though courts do not address issues that were "completely absent" from the due process complaint, *see B.P. v. N.Y.C. Department of Education*, 634 F. App'x 845, 850 (2d Cir. 2015), the IDEA "does not require that alleged deficiencies be detailed in any formulaic manner," as long as the school district has "fair notice" of the claims. *C.F.*, 746 F.3d at 78.

Here, the due process complaint did not include an allegation that a school psychologist was improperly missing from the CSE and therefore the DOE was not provided with fair notice. With respect to the composition of the CSE, Plaintiffs' due process complaint argues that "[t]he CSE team was improperly composed as it lacked, inter alia, properly qualified special education and regular education teachers." P. Ex. A. at 2. This alone is not sufficient to put the DOE on notice that Plaintiffs would be challenging the CSE composition due to a lack of a school psychologist.[41]

Even if the issue were properly raised, the Court would defer to the conclusion of the IHO and SRO that such a procedural violation "did not rise to the level of denial of a FAPE in this instance given that . . . the parent was not denied meaningful participation in the student's educational planning." SRO Decision at 13; *see* IHO Decision at 25; *see,*

---

[41] Plaintiffs further argue that the DOE "opened the door" to such evidence because during opening arguments, DOE counsel stated that the CSE was "attended by the parent as well as district reps." *See* Doc. 17 at 12. Even where a claim is not present in a DPC, "[i]f the district . . . raises a claim or elicits testimony regarding a claim not included in the initial complaint, an IHO may find that the district 'opened the door' to that claim." *Board. of Education v. A.D.*, No. 16-CV-02025, 2017 WL 4466613, at *1 (S.D.N.Y. Oct. 5, 2017) *aff'd*, 739 F. App'x 79 (2d Cir. 2018) (summary order). However, the DOE's general acknowledgement that the CSE was "attended by . . . district reps" is not sufficient to open the door to the particular issue of the absence of a school psychologist or its impact on the development of the IEP. *See, e.g., S.S. v. Katonah Lewisboro Union Free School District*, No. 24-CV-9267 (CS), 2026 WL 357638, at *13 (S.D.N.Y. Feb. 9, 2026) (finding that a district's mention of evaluations performed in its briefing and during an impartial hearing "do not open the door to the issue of whether other evaluations should have been obtained.").

*e.g., M.P.G. ex rel. J.P. v. New York City Department of Education,* No. 08 Civ 8051 (TPG), 2010 WL 3398256, at *9 (S.D.N.Y. Aug. 27, 2010) (finding that plaintiffs had not shown that the lack of a required teacher at a CSE "constituted a denial of [a] FAPE. . . . [A] court must give due weight to the administrative proceedings, and should not substitute its own notions of sound educational policy for those of the authorities which it reviews.").

While the Plaintiffs assert that a school psychologist was "especially necessary where . . . A.S. exhibited mental health symptoms," Doc. 17 at 12, they do not concretely identify how the lack of a school psychologist at the CSE impacted their participation in the development of the IEP. *See Y.A. v. New York City Department of Education*, No. 15-CV-05790 (CM), 2016 WL 5811843, at *18 (S.D.N.Y. Sept. 21, 2016) (noting that a "plaintiff must identify how such technical violations cause enough harm to impede the child's education or the parent's participation in the IEP process") (collecting cases) (internal citations omitted).  Accordingly, the Court finds that a lack of a school psychologist at the CSE did not result in the denial of a FAPE.

### b.  Consideration of Empirical Data

Plaintiffs next argue that the "CSE is legally mandated to look to empirical data, including its own sourced triennial evaluation" and that the DOE never bothered to follow that legal mandate for A.S.  Doc. 14 at 18.  When developing a student's IEP, a district must "review existing evaluation data on the child, including—(i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers."  20 U.S.C. § 1414(c)(1)(A).  "[O]n the basis of that

review," the district must then "identify what additional data, if any, are needed to determine," among other things, "the present levels of academic achievement" of a student. *Id.* § 1414(c)(1)(B). Further, both federal and state law require that a school conduct an evaluation of students receiving special education related services at least once every three years. 20 U.S.C. §1414(b)(2)(B)(ii); 8 N.Y.C.R.R. § 200.4(b)(4). However, a failure to conduct a triennial evaluation does not necessarily make an IEP deficient, when sufficient additional data is considered. *See M.M. ex rel. J.S. v. New York City Department of Education*, No. 14 CIV. 1542 (GBD), 2015 WL 1267910, at *5 (S.D.N.Y. Mar. 18, 2015) (collecting cases), *aff'd sub nom. M.M. v. New York City Department of Education,* 655 F. App'x 868 (2d Cir. 2016).

First, both the IHO and SRO note that the 2023 IEP lists several evaluation results considered by the CSE, including: A.S.'s reading level "measured by a Fountas and Pinnell reading assessment," A.S.'s "oral reading fluency as assessed by the Acadience Benchmark for oral reading fluency," A.S.'s "scores in i-Ready diagnostics," as well as information about his current grade level and feedback from classroom assignments and tests. *See* SRO Decision at 16.

Further, both the IHO and SRO note that, while evidence of a triennial evaluation is missing from the IEP, there is evidence on the record that the district was aware of psychiatric evaluations which the Plaintiffs privately sought that were under three years old. *See id.* A.S.'s 2022 IEP discusses the results of a diagnostic psychiatric evaluation by the NYU Child Center in September of 2020 as well as a subsequent evaluation in January 2021 that parents sought on their own. P. Ex. Q at 4 (stating that "[A.S.]'s parents had a Diagnostic Psychiatric evaluation administered to him in January 2021. According to the

report, . . ." and further noting "[i]n September, 2020, the evaluator reported that [A.S.] and his parents participated in an evaluation at the NYU Child Study Center . . ."). While these evaluations were not referenced again in the 2023 IEP, the IHO noted that the 2023 CSE members were aware of such evaluations, and the SRO did not refute that observation. *See* SRO Decision at 16.

Both the IHO and SRO found that because the CSE had sufficient evaluative material regarding A.S.'s needs, any "procedural violation regarding the sufficiency of evaluative information did not deprive [A.S.] of a FAPE" *See* SRO Decision at 17. As sufficiency of available evaluation material is one of educational policy, and as both the IHO and SRO are in agreement, the Court gives deference to the proceedings below and finds that A.S. was not denied a FAPE because the data the CSE considered was sufficient.

c.  *Failure to Respond to Parents' Request to Reconvene*

Plaintiffs argue that the DOE ignored their "repeated request[s], orally and in writing" to reconvene the CSE in April 2023. Doc. 14 at 18. In particular, Plaintiffs point to the fact that prior to the February 8, 2023 CSE, they emailed school representatives, informing them that they had scheduled an additional neuropsychiatric evaluation for A.S. in March, and requesting that to meet again in the "April 10-21 window to revise [A.S.]'s IEP again according to his latest evaluation." P. Ex. C. At the impartial hearing, A.S.'s mother further testified that she thinks she requested an additional IEP meeting at the February 8, 2023 meeting. Tr. at 497.

However, Plaintiffs point to nothing in the administrative record to show that they requested to meet again after A.S.'s additional neuropsychiatric testing, nor that they alerted the school that the neuropsychiatric testing had occurred. Further, according to

58

A.S.'s mother's testimony, she did meet with the CSE members and other DOE staff later in the spring. *Id*. at 497–98. Though that meeting was not officially a CSE meeting, but rather a parent-teacher conference, she testified that "basically, it was a repeat of his IEP meeting." *Id*. at 498. Accordingly, the Court finds that there was no procedural violation for the school district's failure to reconvene the IEP.

### d. Predetermination

Plaintiffs argue that the IEP for 2023–24 is "nearly identical" to the one for 2022–23, and that this shows improper predetermination. Doc. 14 at 19. "An IEP is not predetermined so long as the district involves the parent in the development of the IEP with an 'open mind.'" *R.B. v. New York City Department of Education*, No. 15CV6331 (DLC), 2016 WL 2939167, at *7 (S.D.N.Y. May 19, 2016), *aff'd*, 689 F. App'x 48 (2d Cir. 2017) (citing *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009)). "Thus, it does not violate the IDEA for district representatives to 'come with preformed opinions regarding the best course of action for the child,' as long as they are 'willing to listen to the parents and the parents have an opportunity to make objections and suggestions.'" *Shantel Talley v. Melissa Aviles-Ramos, et al*, No. 25-CV-0909 (LJL), 2026 WL 592078, at *14 (S.D.N.Y. Mar. 3, 2026) (quoting *E.E. v. N.Y.C. Department of Education*, 2018 WL 4636984, at *6 (S.D.N.Y. Sept. 26, 2018)).

In arguing that the 2022 and 2023 IEPs are "nearly identical," Plaintiffs highlight that the 2023 IEP adopts "standard promotion criteria just like the previous year's IEP." Doc. 14 at 19. It is true that both IEPs check a box stating that A.S.'s promotion criteria is "standard" as opposed to modified," and that the "Parent Concerns" about A.S.'s

promotional criteria are also identical.  *Compare* D. Ex. 4 at 27 *with* P. Ex. Q at 24.[42]

Even looking beyond the promotional criteria identified by Plaintiffs, both the 2022 and

2023 IEP contain the same placement recommendations and identical sentences detailing

that that the CSE considered two additional placement options that were disregarded, a

"General Education class with Related Services" and a "Special Class."  *Compare* D. Ex.

4 at 25, 27–28 *with* P. Ex. Q at 22, 24–25.  Further, when describing the CSE, A.S.'s

mother testified that her two big concerns were A.S.'s "physical safety" and his academ-

ics, and that she felt that the CSE merely "did the boilerplate thing, going through the

IEP."  Tr. 482–83.   Also as noted above, the 2023 IEP did not mention any of the Par-

ents' concerns about bullying.  D. Ex. 4 at 5.

However, the Court defers to the SRO's finding that overall, the 2023 IEP con-

tains updates that defeat the predetermination claim.  A.S.'s test results were updated, as

were the qualitative assessments of in-class performance, *compare* D. Ex. 4 at 4 *with* P.

Ex. Q. at 2–3; the 2023 IEP states that A.S. should receive integrated co-teaching for mu-

sic and technology, *compare* D. Ex. 4 at 18–19 *with* P. Ex. Q at 17; the 2023 IEP includes

concern that A.S.'s mother raised about whether A.S. would benefit from physical ther-

apy, D. Ex. at 6; accordingly, A.S. was evaluated "really soon after the [CSE] meeting"

for physical therapy eligibility, Tr. at 482; A.S.'s counseling services and occupational

therapy cadence increased in 2023, *compare* D. Ex. 4 at 19 *with* P. Ex. Q at 17; and the

2023 IEP included new annual goals for A.S.  *See* SRO Decision at 14–15 (detailing all

of the differences).  Further, while the concerns about bullying were not mentioned in the

---

[42]  Both IEPs document the parents' concerns in the same way:  "At this time, [A.S.]'s parents have a concern regarding his academics and handwriting abilities . . . ."  *Compare* D. Ex. 4 at 27 *with* P. Ex. Q at 24.  In the 2023 IEP, this concern is also repeated in the academic achievement section.  *See* D. Ex. 4 at 4.

2023 IEP, as discussed above, the school adequately responded to the incidents.  The

Court agrees with the SRO, that Plaintiffs have not sufficiently shown that the 2023 IEP

was predetermined to constitute a denial of a FAPE.

2.  *Conduct of the Impartial Hearing*

Plaintiffs argue that the IHO permitted the DOE to engage in numerous violations

that threatened the integrity of the impartial hearing, including:  allowing testimony of

DOE witnesses that had not been timely disclosed; allowing the DOE to "drag the pro-

ceedings out by numerous months"; "answer[ing] questions for, and testify[ing] for, the

DOE witnesses; and allowing the DOE to engage in "pervasive unprofessionalism."

Docs. 14 at 19–21; 17 at 13–14.  The DOE argues that the SRO correctly found that:  the

admission of DOE witnesses in question was not prejudicial to Plaintiffs; the delays in

the impartial hearing proceedings were at the request of both parties; and the decision

should not be overruled due to allegations of unprofessionalism.  Docs. 15 at 22–24; 18 at

8–9.

Generally, "IHOs have 'broad discretion' in how they conduct the impartial hear-

ing."  *A.S. v. Board of Education Shenendehowa Central School District*, 2019 WL

719833, at *9 (N.D.N.Y. Feb. 20, 2019) (quoting *M.M. v. NYC Department of Education*,

2017 WL 1194685, at *7 (S.D.N.Y. Mar. 30, 2017)).  As a general matter, "while admin-

istrative law judges do not bear all the badges of independence that characterize Article

III judges, they must adhere to the same standard of impartial decision-making."

*Kendrick v. Sullivan*, 784 F. Supp. 94, 102 (S.D.N.Y. 1992).  "Thus, an administrative

law judge may not act in a systematically biased manner in deciding cases.  Rather, an

administrative law judge is required to reach decisions by impartially applying the legal rules to the facts established by the record in each case." *Id.*

The Court finds that the conduct of the impartial hearing did not rise to the level of threatening the integrity of the impartial hearing itself.  First, the Court finds that the IHO's decision to admit the testimony of Carmona and Chryssos-Lignos was proper. Both federal and state regulations provide that a party has the right to "[p]rohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five business days before the [impartial] hearing."  34 C.F.R. § 300.512(a)(3); 8 N.Y.C.R.R. § 200.5(j)(3)(xii)(a).  However, where there is no articulated prejudice due to a violation of the five-day rule, courts do not find that such a violation endangered the impartiality of the hearing.  *See, e.g., Jusino v. New York City Dep't of Education,* No. 14 Civ. 3617 (ENV) (ST), 2016 WL 9649880, at *6 (E.D.N.Y. Aug. 8, 2016), *aff'd,* 700 F. App'x 25 (2d Cir. 2017) ("Like all procedural rules and deadlines, those set in this sort of administrative proceeding were set to ensure a fair and expedited process, not a summary 'gotcha' game.  No prejudice from the failure to notice [a witness's] testimony five days before the hearing (as opposed to the four days' notice given before her testimony) was articulated").

In the instant case, the IHO acknowledged that the DOE did not disclose either Carmona or Chryssos-Lignos in a timely fashion in the amended witness list and initially stated "I am not inclined to amend the witness list," but after both parties had the opportunity to argue the matter, he ultimately allowed their testimony to be heard.  *See* Tr. 178–85.  With respect to Carmona, the IHO ultimately concluded that, as the impartial hearing was already set to continue another day, and as Carmona convened the 2023 IEP

62

team there was no prejudice to Plaintiffs in allowing her testimony "provided that she is available." *Id.* at 185. With respect to Chryssos-Lignos, who was to testify about the alleged bullying of A.S., the IHO ultimately decided that he was inclined to have a "full record" of the alleged bullying and decided to admit her testimony as well as Plaintiffs' emails of alleged bullying incidents, which were not yet a part of the record. *Id.* at 191–93. The Court agrees with the SRO that this decision was within the IHO's discretion and accordingly did not endanger the integrity of the impartial hearing.

Second, the Court does not find that the adjournments endangered the integrity of the impartial hearing. State regulation requires that any extension granted by the IHO be for no more than 30 days, and further the IHO must consider whether delay will adversely impact the child's education, whether the party has afforded a fair opportunity to present their case, any adverse consequences due to delay, and whether there has already been a delay in the proceedings. N.Y.C.R.R.. 8, § 200.5(j)(5)(d)(i)–(ii).

With respect to the first adjournment, Plaintiffs first argue that the IHO impermissibly granted the DOE's request without giving the Plaintiff an opportunity to respond. Doc. 17 at 13. This is true; however, once the Plaintiffs expressed their objection to the adjournment on the basis that the DOE failed to meet a witness disclosure deadline, the IHO apologized and found that given Plaintiffs' objection the adjournment would not be granted. Doc. 17-3 at 4–5. The Court finds no impermissible error here.

Plaintiffs also argue that, in those emails, the IHO impermissibly threatened to punish Plaintiffs' counsel's 19 other, unrelated cases, holding them "hostage to extort Plaintiffs' consent to DOE's request." Doc. 17 at 13. It is true that, after Plaintiffs' counsel stated their objections to the adjournment, the IHO references Plaintiffs'

counsel's other cases in his email. *See* Doc. 17-3 at 2–3 ("[Plaintiffs' counsel], given your strong preference to go to hearing in your cases, please ensure that your office is prepared to schedule the remaining 19 cases on my docket when we meet on the 15th."). Counsel stated that making decisions about their other cases due to the proceedings in the instant case was improper and prejudicial, and the IHO acknowledged their objection. *Id.* at 3 ("This is the first time that I've encountered the argument that scheduling a hearing, as requested by [Plaintiffs] in a Due Process Complaint, is prejudicial to the [Plaintiffs]. Noted."). Plaintiffs do not identify additional evidence to suggest their other proceedings were impacted. The Court finds that this exchange alone did not threaten the integrity of the hearing.

Finally, while the record demonstrates that Plaintiffs eventually consented to the adjournment, *see* Tr. 3–4, Plaintiffs argue that the IHO, off the record, "expressly threatened to exclude [Plaintiffs]'s timely disclosures if they did not consent to the DOE's requested adjournments." Doc. 14. at 20. Looking to the attached email, after learning that the DOE's witness disclosures were late, the IHO stated that the hearing would not be adjourned. *See* Doc. 17-3 at 4–5. However, a few days later, the IHO concluded that both the DOE and the Plaintiffs' witness disclosures violated a "Pre-hearing Conference Summary and Order," the DOE for timeliness, and the Plaintiffs for failing to provide the name and title of the witnesses and a brief description of the witness's testimony. Doc. 17-4 at 2. Therefore, while Plaintiffs' witness list was timely disclosed, the disclosure was insufficient. As the IHO had already stated that he would also exclude the DOE's

evidence for a procedural violation, there is no impropriety in also stating he would exclude the Plaintiffs' witness for a procedural violation, if the hearing was not adjourned.[43]

With respect to the second adjournment, which was granted at the January 18, 2024 hearing, prior to selecting the date, the parties had already agreed to continue the impartial hearing to February 2024. *See* Tr. at 193–203. The IHO stated that his first availability was February 26, 2024, and that he had a preference for dedicating several hours to the hearing. *Id.* The DOE counsel provided limited availability in late February and more availability in early March. *Id*. The hearing record ultimately shows that the DOE continued presenting its case on February 26, 2024, and in part on March 4, 2024; while Plaintiffs presented their case in part on March 4, 2024 and on March 18, 2024. SRO Decision at 10. The Court finds that this second adjournment requested by the DOE was not improper.

The Court also finds no merit in Plaintiffs' final arguments: (1) that the "IHO even went so far as to answer questions for, and testify for, the DOE" or (2) that the DOE' counsel's "pervasive unprofessionalism" threatened the integrity of the impartial hearing. *See* Doc. 14 at 19. First, an IHO "may limit examination of a witness by either party whose testimony the impartial hearing officer determines to be irrelevant, immaterial, or unduly repetitious." 8 N.Y.C.R.R. § 200.5(j)(3)(xii). The incidents which Plaintiffs cite do not demonstrate that the IHO "testified for" the DOE, or that the IHO provided support for the DOE or their position, but rather appear to be the IHO attempting to

---

[43] Plaintiffs make one final argument about the IHO's behavior, that he impermissibly "doctor[ed] email threads so that they excluded exchanges in which he recognized DOE's untimeliness." Doc. 17 at 14. The exhibit Plaintiffs attach demonstrate that, when the IHO emailed the parties that both sets of witness disclosures were procedurally insufficient, his attached email thread did not include the last few emails of the thread. *See* Doc. 17-4. As Plaintiffs were in the initial email thread, the Court finds that this does not threaten the integrity of the hearing.

ensure that the hearing progressed, for example, by reading a section of the IEP which a DOE witness had already identified.  *See* Tr. 290–92.  Finally, the cited incidents of "unprofessionalism" do not rise to the level of threatening the integrity of the impartial hearing, and the hearing transcript shows that the IHO was able to retain control throughout. *See* Tr. 203–204, 288–89, 296.

### C.  Credibility Determinations

Plaintiffs argue that each of the IHO's credibility determinations as to DOE witnesses should be overturned as because the testimony is "internally inconsistent" and they "contradict [the mother's] testimony."  Docs. 14 at 21–25; 17 at 14.  The DOE argues that the IHO's finding that each of the DOE's witnesses were credible should be affirmed, as the record does not compel a contrary conclusion.  Docs. 15 at 24–29; 18 at 10.

"[C]redibility findings by an IHO are accorded deference unless non-testimonial, extrinsic evidence justifies a contrary conclusion." *Neske v. Porter*, No. 21-CV-10363 (VEC), 2022 WL 3290561, at *4 (S.D.N.Y. Aug. 11, 2022), *aff'd sub nom. Neske v. New York City Department of Education,* No. 22-2962-CV, 2023 WL 8888586 (2d Cir. Dec. 26, 2023) (quoting *P.G. ex rel. D.G. v. City Sch. Dist. of New York*, No. 14-CV-1207, 2015 WL 787008, at *16 (S.D.N.Y. Feb. 25, 2015)).  An IHO's credibility determination can also be overturned if the "record, read in its entirety, compels a contrary conclusion." SRO Decision at 11; *see M.W. v. New York City Department of Education,* 869 F.Supp.2d 320, 330 (E.D.N.Y. 2012) *aff'd,* 725 F.3d 131 (2d Cir.2013) (citing *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520, 529 (3d Cir.1995)).  Plaintiffs argue that the record as a whole

compels overturning the IHO's credibility findings as to each of the five DOE witnesses: Stamos, Martinosky, Angelinas, Chryssos-Lignos, and Carmona.  Doc. 14 at 21–25.

Looking to the record as a whole, the Court agrees with the SRO and finds no reason to overturn the credibility determinations of the IHO.[44]  Plaintiffs highlight alleged inconsistencies between DOE witness testimony.  *E.g. compare* Tr. at 295 (Chryssos-Lignos stating that while she was not the one who wrote "parents have not expressed any concern in regard to his social development" in A.S.'s 2023 IEP, but guessing that Carmona did) *with id*. at 370 (Carmona testifying that she did not recall who wrote the line); *compare id*. at 98–100 (Martinosky testifying that A.S. was mature, silly, and very friendly) *with id*. at 154 (Angelinas testifying that A.S. was "very reserved, to himself" in math class);  *compare id*. at 36 (Stamos testifying that A.S. had made a "lot of progress") *with id*. at 74–76 (Stamos testifying that, in the IEP, she had indicated that A.S. had made "little progress").

Plaintiffs also highlight instances in which the DOE witnesses could not recall sending or receiving emails concerning A.S.'s alleged bullying.  *E.g. compare id*. at 140 (Martinosky testifying that she could not recall authoring an email during the 2022–23 school year about A.S.'s injuries) *with* P. Ex. J (Martinosky email detailing that A.S. walked into a student playing jump rope and had a "small red spot" on his leg); *e.g.* Tr. at 141–42 (Martinosky indicating she had no knowledge of A.S. being bullied or injured despite being on Plaintiffs emails concerning injuries); *id*. at 47–50 (Stamos testifying that she could not recall an email about A.S.'s emergency room visit injury despite

---

[44] In its decision, after detailing the testimony of the witnesses for ten pages, *see* IHO Decision at 7–17, the IHO found all five of the DOE witnesses and the three Plaintiffs' witnesses "to be genuine and credible in all aspects."  *Id.* at 24.

receiving it). Further, Plaintiffs take issue with the witnesses' understanding of the alleged bullying and the impact it had on their evaluations. *See, e.g.,* Doc. 14 at 23 (taking issue with the fact that Martinosky would not answer whether a student being bullied is always relevant to her work as a teacher); Tr. at 137 (Martinosky testifying that she could not answer if being a victim to bullying was relevant to her work "because every student with a diagnosis of autism is different from one another. You can't generalize . . ."); Doc. 14 at 24 (taking issue with Chryssos-Lignos' testimony that A.S. did not experience bullying but rather conflicts with other students).

The Court agrees with the SRO that "[s]ome of the examples cited by the parents could have been interpreted by the IHO as explainable by confusion, mistake, or lapse in memory rather than a lack of credibility, and such findings are exactly the type of determinations entitled to deference." SRO Decision at 11–12. Further, to the extent that Plaintiffs argue that the DOE witnesses are not credible due to their definitions of bullying or their interpretations of how allegations of bullying impact their various roles, the Court defers to the findings of the IHO and SRO as this is a matter of educational policy which the IHO and SRO are more substantively equipped to evaluate. The cited examples and a review of the record do not support overturning the IHO's credibility determinations as to the DOE's five witnesses.

### D. Remaining Claims

The DOE argues that Plaintiffs' remaining claims should be dismissed because: (1) the Rehabilitation Act and the ADA requires a showing of bad faith, gross misjudgment, or deliberate indifference and the SRO has already determined that the district did not act with deliberate indifference; (2) Section 1983 claims are unavailable

68

for claims that are also redressable by the IDEA and Plaintiffs do not establish a policy as required for *Monell* liability; and (3) Plaintiffs did not reserve a right to supplement their state law claims.  Docs. 15 at 25–27; 18 at 10.  Meanwhile, Plaintiffs argue that they have properly reserved their ADA, Rehabilitation Act, Section 1983, and state law claims and can keep these in the alternative.  Docs. 14 at 25; 17 at 14–18.

### 1. *ADA and Rehabilitation Act Claims*

"[W]hile the IDEA aims 'to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to [the child's] unique needs, Title II of the ADA and section 504 of the Rehabilitation Act 'cover people with disabilities of all ages, . . . both inside and outside schools[.]' Title II and section 504 'aim to root out disability-based discrimination, enabling each covered person . . . to participate equally to all others in public facilities and federally funded programs.'" *T.J. on behalf of B.W. v. Board of Education of Mount Vernon City School District*, No. 3:17-CV-9592 (JCH), 2019 WL 13170168, at *13 (S.D.N.Y. Sept. 30, 2019) (citing *Fry v. Napoleon Community Schools*, 137 S. Ct. 743, 755 (2017)).  To prove ADA and Section 504 claims, a plaintiff must show "something more than a mere violation of the IDEA," it requires showing "bad faith or gross misjudgment." *C.L. v. Scarsdale Union Free School District*, 744 F.3d 826, 841 (2d Cir. 2014) (citing *Wenger v. Canastota Central School District,* 979 F.Supp. 147, 152 (N.D.N.Y.1997)) ; *see also T.J.*, 2019 WL 13170168, at * 15 ("Thus, the question before this court is whether [the plaintiff] has adequately stated a claim under the ADA and section 504 . . . To do so, she must first establish that [the student] was denied a FAPE.").  Accordingly, as the Court has found

that the DOE did not deny A.S. a FAPE for the 2023–24 school year, the Court dismisses the Plaintiffs' ADA and Rehabilitation Act claims.

### 2. 42 U.S.C. § 1983 Claim

"[T]he denial of a 'free appropriate public education,' has been held a constitutional deprivation which is actionable under Section 1983." *D.F. v. New York City Department of Education*, No. 24-CV-3087 (LJL), 2025 WL 1425752, at *12 (S.D.N.Y. May 16, 2025) (internal citation omitted) (collecting cases). To prove an § 1983 claim, a plaintiff must "must satisfy two requirements: (1) they must first prove the existence of a municipal policy or custom in order to show the municipality took some action that caused their injuries, and (2) the plaintiffs must establish a causal connection between the policy and the deprivation of their federal rights." *BD v. DeBuono*, 130 F. Supp. 2d 401, 437 (S.D.N.Y. 2000). The policy need not be codified, but can be *de facto*, meaning the policy is "pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker." *Tieman v. City of Newburgh,* No. 13 Civ. 4178 (KMK), 2015 WL 1379652, at *16 (S.D.N.Y. Mar. 26, 2015) (quoting *Board of County Commissioners of Bryan County*, 520 U.S. 397, 404 (1997)). Such a *de facto* policy may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law. *Id.*

Plaintiffs claim that the DOE has a *de facto* policy that led to violations of the IDEA, the Rehabilitation Act, the ADA, and the Fourteenth Amendment. Doc. 1 ¶¶ 86–91. While Plaintiffs allege that the DOE engaged in "policies, practices and customs" that have led to violations, they do not actually allege any facts related to a *de facto* policy or that any other student aside from A.S. has been impacted by such a policy. Doc.

1. ¶¶ 88, 90. Merely alleging the injury to A.S. is insufficient to demonstrate that the DOE's actions are "so widespread as to have the force of law." *Tieman*, 2015 WL 1379642, at *16. Accordingly, the Court dismisses Plaintiffs § 1983 claim.

### 3. State Law Claims

Finally, having resolved all of Plaintiffs' federal claims against them, the Court declines to adjudicate Plaintiffs' related state law claims. Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 27 (2025) (stating that, under § 1367(a), as under *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966), supplemental jurisdiction applies to state-law claims that arise "from the same facts" as a federal-law claim over which a court has original jurisdiction). The doctrine of supplemental jurisdiction is traditionally "a doctrine of discretion, not of plaintiff's right." *Kolari v. N.Y.-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *United Mine Workers*, 383 U.S. at 726). Subsection (c) of § 1367 enumerates circumstances in which a district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)[.]" 28 U.S.C. § 1367(c). One such circumstance is where, as here, "the district court has dismissed all claims over which it has original jurisdiction." *Id.* at § 1367(c)(3). Having dismissed all of Plaintiffs' federal claims, the Court declines to adjudicate Plaintiffs' state law claims as well.

## V.    CONCLUSION

For the reasons stated below, Plaintiffs' motion for summary judgment is

DENIED and the DOE's motion for summary judgment is GRANTED.  The Clerk of

Court is respectfully directed to terminate the motions, Docs. 14, 15, and close the case.


It is SO ORDERED.


Dated:    March 31, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.